Tom L. NELSON et al., Petitioners,

v.

Edward M. KRUSEN and Baylor University Medical Center, Respondents.

No. C–1429.

Supreme Court of Texas.

Oct. 17, 1984.

Rehearing Denied Nov. 21, 1984.

Windle Turley, Paula Fisette-Sweeney, and Lee Steinberg, Dallas, for petitioners.

Thompson & Knight, Richard E. Gray, Burford & Ryburn, Wayne Pearson, Michael S. Holloway and Catherine A. Gerhauser, Dallas, for respondents.

ON MOTION FOR REHEARING

SPEARS, Justice.

We withdraw our opinion and judgment of November 16, 1983, and substitute the following.

Tom and Gloria Nelson brought a wrongful birth suit in their own behalf and a wrongful life suit as next friends of Mark Nelson, their minor son, against Dr. Edward Krusen and Baylor University Medical Center. The Nelsons' suits alleged that Dr. Krusen negligently advised them that Mrs. Nelson was not a genetic carrier of Duchenne muscular dystrophy and was no more likely than any other woman to have a child afflicted by the disease. The Nelsons further alleged that, had they known of the risk that their child would be born with the disease, they would have terminated the pregnancy. The Nelsons alternatively claimed that Baylor negligently conducted or reported certain tests thereby causing Dr. Krusen to misinform them.

The trial court rendered summary judgment for Dr. Krusen and Baylor on the grounds that the statute of limitations had run on the wrongful birth claim and that no cause of action for wrongful life exists in Texas. The court of appeals affirmed. 635 S.W.2d 582. We reverse the court of appeals insofar as it held the statute of limitations, article 5.82, section 4 of the Insurance Code, barred the Nelsons' claims. We affirm the court of appeals holding that no cause of action for wrongful life exists in Texas.

■ This is an appeal from a summary judgment; therefore, we take as true the uncontroverted evidence of the non-movants. *Swilley v. Hughes,* 488 S.W.2d 64 (Tex.1972). The summary judgment evidence showed that the Nelsons already had one child with Duchenne muscular dystro-

phy when they learned in 1976 that Mrs. Nelson was again pregnant. The Nelsons consulted Dr. Krusen to determine whether Mrs. Nelson was a genetic carrier of the disease. Dr. Krusen examined Mrs. Nelson on three separate occasions between April and June of 1976, and based on test results, assured Mrs. Nelson that she was not a carrier. In light of Dr. Krusen's opinion, the Nelsons chose not to terminate the pregnancy, and Mark Nelson was born November 24, 1976. On November 12, 1979, a nursery school examination revealed that Mark had tight heel cords bilaterally. As a result, Mark was referred to a pediatric neurologist, who determined from an examination on February 20, 1980, that Mark had Duchenne muscular dystrophy. Mark was three years and three months old at this time.

The neurologist based his diagnosis in part on Mark's "lordotic and clumsy gait." Although this clumsiness may have been evident during Mark's first two years, during that time these symptoms could be discounted as simply the result of being two years old and learning to walk. Only as the child grew older and continued to exhibit this clumsiness, however, did the possibility of a neuromuscular defect become detectable to the trained eye.

## I. *Statute of Limitations*

Dr. Krusen and Baylor moved for summary judgment, claiming that the Nelsons' actions were barred because they were not brought within two years of the last examination by Dr. Krusen. The defendants relied on the limitations period prescribed by article 5.82, section 4 of the Insurance Code, which provides:

Notwithstanding any other law, no claim ... for compensation for a medical treatment or hospitalization may be commenced unless the action is filed within two years of the breach or the tort com-

plained of or from the date the medical treatment that is the subject of the claim or the hospitalization for which the claim is made is completed .... [1]

The limitations period of article 5.82, by its terms, arguably began running on the date of the last examination by Dr. Krusen or on the date of Mark's birth and barred the Nelsons' claims two years later. Under our holding in *Sax v. Votteler*, 648 S.W.2d 661 (Tex.1983), the statute cannot cut off Mark's cause of action before he reaches the age of legal capacity. If applied literally, the statute would, however, operate to bar the parents' cause of action before they knew it existed, even though they did not discover, and could not reasonably have discovered, their injury within two years. The Nelsons contend that applying the statute in this manner is unconstitutional.

In *Gaddis v. Smith*, 417 S.W.2d 577 (Tex.1967), a medical malpractice case, this court adopted the "discovery rule," providing that the statute of limitations did not begin to run until the patient learned of, or, in the exercise of reasonable care and diligence, should have learned of, the alleged malpractice. *Id.* at 580. The rule in *Gaddis* was adopted as a matter of statutory construction, because the limitations provision, article 5526, Tex.Rev.Civ.Stat.Ann.,[2] provided that the suit must be brought within two years of the date the cause of action *accrued*. We held that a cause of action does not accrue until the plaintiff knows, or has reason to know, of his injury. In contrast, article 5.82, section 4 contains no accrual language and thus imposes an absolute two-year statute of limitations, regardless of when the injury was discovered.

The Nelsons challenge the statute on several constitutional grounds. They claim that the statute denies them equal protection and due process under the fourteenth

---

**1.** Act of June 3, 1975, ch. 330, § 1, 1975 TEX. GEN.LAWS 864, *repealed by* Medical Liability and Insurance Improvement Act, ch. 817, pt. 4, § 41.03, 1977 TEX.GEN.LAWS 2039, 2064. Essentially the same provisions are now found in

TEX.REV.CIV.STAT.ANN. art. 4590i, § 10.01 (Vernon Supp.1984).

**2.** *Amended by* Act of June 13, 1979, ch. 716, § 1, 1979 TEX.GEN.LAWS 1768.

amendment to the United States Constitution. Under the Texas Constitution, they claim that the statute violates the article I, section 3 prohibition against public emoluments, the section 19 due process guarantee, and the section 13 "open courts" provision. Article I, section 13 provides in part:

... All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

Tex. Const. art. I, § 13. The Nelsons argue that this guarantee of a remedy by due course of law makes any legislative attempt to bar their cause of action prior to its discovery unconstitutional. Our disposition of the Nelsons' open courts argument makes consideration of the other constitutional claims unnecessary.

 The numerous decisions of this court construing article I, section 13 establish that the guarantee of a remedy by due course of law is a substantial right, independent of other constitutional provisions. Although sections 13 and 19 of article I both guarantee due process, *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex.1983), the two Texas due course of law provisions are not coterminous. Separate due process and open courts guarantees were included in the seventh and eleventh declarations of rights in the first constitution of Texas as a sovereign republic. These separate rights have been preserved in every constitution since. *See* Tex. Const. (1836); *see also* 1 G. Braden, *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 47 (1977).

 The common thread of this court's decisions construing the open courts provision is that the legislature has no power to make a remedy by due course of law contingent on an impossible condition. In *H. Runge & Co. v. Wyatt*, 25 Tex. (Supp.) 291 (1860), the court was faced with the issue of whether a defendant had the right to be sued in his home county when that county was newly severed from an existing county and did not yet have courts. Relying on the open courts provision, the court concluded that the legislature could not have intended to force plaintiffs to sue in a county where there were no tribunals to provide a remedy by due course of law. *Id.* at 294; *accord Clark v. Goss*, 12 Tex. 395 (1854); *O'Shea v. Twohig*, 9 Tex. 336 (1852).

In *Dillingham v. Putnam*, 109 Tex. 1, 14 S.W. 303 (1890), this court stated, "A law which practically takes away from either party to litigation the right to a fair and impartial trial in the courts provided by the constitution for the determination of a given controversy, denies a remedy by due course of law." 14 S.W. at 304. The court went on to hold that a legislative act making the right of appeal depend on the giving of a supersedeas bond, without reference to the appellant's ability to pay, was unconstitutional. *Id.* 14 S.W. at 305. Of course, for those unable to pay, the bond was an impossible condition.

This principle was best illustrated in the case of *Hanks v. City of Port Arthur*, 121 Tex. 202, 48 S.W.2d 944 (1932). The city charter exempted the city from liability for injuries caused by street defects, unless the city had written notice of the defect at least twenty-four hours prior to the injury. In other words, the plaintiff, Mrs. Hanks, was required to give the city notice of the defect before she was injured. In posing the issue, the court asked,

Can it be "due process" to say that although she did not see the defect, and did not know of its existence, yet before she can recover for the city's wrongful act (if it was wrongful), she must have notified the city of the defect twenty-four hours before she received her injuries?

48 S.W.2d at 947–48. The court declared the notice provision unconstitutional, stating,

[I]t is obvious that notice of the defect, to be made by one ignorant of its existence, twenty-four hours before the subsequent injury, is unreasonable. *A different question would be presented if the notice requirement applied only to those who had knowledge of the defect which brought about the injury.* To

require notice of those who knew nothing of a defective condition is to impose an unreasonable condition precedent to recovery, and which is, we believe, beyond the legislative power.

*Id.* 48 S.W.2d at 948 (emphasis added). The court amplified its reasoning by pointing out that the notice provision, in addition to barring the claim of one who did not know of the defect, would cut off the rights of children or others who were prevented by incapacity from complying. The court stated,

> Would that be reasonable? *Is the requirement of a thing impossible from an infant, or one incapacitated for any reason due process?* We think not; and yet it is a condition precedent to recovery .... Obviously the charter requirement in respect to the notice here involved is unreasonable, and, if unreasonable, it violates the due process clause of the Constitution.

*Id.* (emphasis added).

The court in *McCrary v. City of Odessa,* 482 S.W.2d 151 (Tex.1972), applied similar reasoning. A city charter provision requiring notice within sixty days of an accident was challenged as violating article I, section 13, to the extent the notice requirement applied to minors. The court reasoned that the notice provision presupposed the existence of a person capable of complying. In the case of minors, this presupposition was false, because minors were legally incapacitated from bringing suit and, hence, powerless to comply with the notice requirement. For this reason, they, like those unable to comply because of physical or mental incapacity, were excused from compliance until their disabilities were removed. *See also Lebohm v. City of Galveston,* 154 Tex. 192, 275 S.W.2d 951 (1955); *City of Terrell v. Howard,* 130 Tex. 459, 111 S.W.2d 692 (1938).

The reasoning of these decisions was reaffirmed in *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983), a medical malpractice case specifically addressing the constitutionality of article 5.82, section 4 of the Insurance Code as applied to minors. We recognized that article I, section 13 of the Texas Constitution guarantees that Texas citizens bringing common law causes of action will not unreasonably be denied access to the courts. 648 S.W.2d at 664. Based on *Hanks v. City of Port Arthur* and *McCrary v. City of Odessa,* we held that "the right to bring a well-established common law cause of action cannot be effectively abrogated by the legislature absent a showing that the legislative basis for the statute outweighs the denial of the constitutionally-guaranteed right of redress." 648 S.W.2d at 665–66. We concluded that the legislative basis for article 5.82 was legitimate and adopted a two-step analysis for weighing the litigant's constitutional right to redress against the purpose of the statute.

The minor plaintiff, Lori Beth Sax, satisfied the first criterion, because she was denied an established common law cause of action for malpractice. *See, e.g., Texas & P. Ry. Co. v. Morin,* 66 Tex. 225, 18 S.W. 503 (1886). We held that Lori Beth Sax also satisfied the second criterion, which required that she show the restriction was unreasonable and arbitrary. Because article 5.82 cut off forever her cause of action before she was legally able to sue, without providing a reasonable substitute, we held that the limitations provision unconstitutionally abrogated her right to redress. 648 S.W.2d at 667 (citing *Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556 (1916), *aff'd* 249 U.S. 152, 39 S.Ct. 227, 63 L.Ed. 527 (1919)).

These decisions lead to the conclusion that article 5.82 as applied here violates the open courts provision by cutting off a cause of action before the party knows, or reasonably should know, that he is injured. How is the impossible condition placed on the Nelsons any less onerous than requiring a party to sue where there are no courts? *See H. Runge & Co. v. Wyatt,* 25 Tex.(Supp.) 291 (1860). How is the condition less arbitrary than requiring a bond from one unable to pay? *See Dillingham v. Putnam,* 109 Tex. 1, 14 S.W. 303 (1890). Is the Nelsons' position any

different from Mrs. Hanks, and others incapacitated for any reason, who likewise could not meet the impossible requirement of giving notice of that of which they were not aware? *See Hanks v. City of Port Arthur,* 121 Tex. 202, 48 S.W.2d 944 (1932). Is a person whose injuries are not immediately discoverable any more able to sue during the period of undiscoverability than are children during their period of legal disability? *See Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983); *McCrary v. City of Odessa,* 482 S.W.2d 151 (Tex.1972).

There is no qualitative difference between the unreasonable condition imposed on the Nelsons and those previously struck down by this court. In one respect, the circumstances in the present case are even more compelling than in *Sax* and *McCrary.* In those cases, it was possible for the parents to bring their children's suits in time, even if limitations were allowed to run. In the present case, if the Nelsons' assertions are true, the nature of the injury made it unreasonable to expect that anyone, parent or child, would be able to bring suit within two years.

The limitation period of article 5.82, section 4, if applied as written, would require the Nelsons to do the impossible—to sue before they had any reason to know they should sue. Such a result is rightly described as "shocking" and is so absurd and so unjust that it ought not be possible. *Hays v. Hall,* 488 S.W.2d 412, 414 (Tex. 1972); *Gaddis v. Smith,* 417 S.W.2d 577, 580, 581 (Tex.1967). Deferring to the legislative imposition of such an unreasonable condition would amount to an abdication of our judicial duty to protect the rights guaranteed by the Texas Constitution, the source and limit of legislative as well as judicial power. This, we cannot do. We hold that article 5.82, section 4 of the Insurance Code is unconstitutional, under the open courts provision, to the extent it purports to cut off an injured person's right to sue before the person has a reasonable opportunity to discover the wrong and bring suit.

Neither *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983), nor *Robinson v. Weaver,* 550 S.W.2d 18 (Tex.1977), is to the contrary. In both cases, the adult litigants discovered their injuries while there was still a reasonable time to sue. In both cases the parties had over one year from the date the injuries were discovered, even if the two year limitations period was not tolled. The statutes of limitation were not unconstitutional as applied to the parties in *Sax* and *Robinson;* hence, there was no reason to strike down the statutes merely because they might operate in an unconstitutional manner in another case. *See City of Waco v. Landingham,* 138 Tex. 156, 157 S.W.2d 631 (Tex.1941); *see also Kentucky Union Co. v. Kentucky,* 219 U.S. 140, 31 S.Ct. 171, 55 L.Ed. 137 (1910). In stark contrast, the Nelsons were cut off well before they discovered Mark's condition. There was no time within two years of the last examination or of Mark's birth when they could have sued.

The legal issue in *Robinson v. Weaver* is distinguishable as well. *Robinson* involved the construction of article 5526, Tex.Rev. Civ.Stat.Ann. The question was whether in a misdiagnosis case the court should construe the accrual language of that statute to mean the date on which the injury was discovered, as had been done in *Gaddis v. Smith,* 417 S.W.2d 577 (Tex.1967). No constitutional issue was raised or decided in *Robinson.* Article 5.82, on the other hand, does not use the term "accrue" and simply counts the limitations period from a specific date. The constitutional question is squarely raised in the present case.

We hold that article 5.82, section 4 of the Insurance Code as applied in this case violates the open courts provision of article I, section 13 of the Texas Constitution. Therefore, the parents' cause of action for "wrongful birth" is not barred by limitations. In *Jacobs v. Theimer,* 519 S.W.2d 846 (Tex.1975), we approved a cause of action for "wrongful birth," under which parents may recover the expenses reasonably necessary for the care and treatment of their child's impairment from a physician

who has negligently failed to inform the parents of the risk of that impairment.

## II. *Wrongful Life*

The remaining issue in this case is whether we should grant the child a cause of action for "wrongful life," a question not reached in *Jacobs.* Mark, through his next friend, asserts that but for Dr. Krusen's negligence in failing to inform the Nelsons of the risk of Duchenne muscular dystrophy, the Nelsons would have aborted the pregnancy. Therefore, the doctor's negligence was the proximate cause of Mark's being born, and having to live, in an impaired condition. The parents seek damages on Mark's behalf as compensation for the added medical expenses and for the pain and suffering of having to live with muscular dystrophy.

The majority of states that have considered the issue have refused to adopt a cause of action for wrongful life. *See Elliott v. Brown,* 361 So.2d 546 (Ala.1978); *Moores v. Lucas,* 405 So.2d 1022 (Fla.Dist. Ct.App.1981); *Strohmaier v. Associates in Obstetrics & Gynecology,* 122 Mich.App. 116, 332 N.W.2d 432 (1982); *Becker v. Schwartz,* 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978); *Speck v. Finegold,* 268 Pa.Super. 342, 408 A.2d 496 (1979), *aff'd by an equally divided court,* 497 Pa. 77, 439 A.2d 110 (1981); *Dumer v. St. Michael's Hospital,* 69 Wis.2d 766, 233 N.W.2d 372 (1975). *See also Payton v. Abbott Labs,* 386 Mass. 540, 437 N.E.2d 171 (1982) (no cause of action for child for injuries resulting from administration of DES to mother, if child would not have been born but for use of DES).

These cases give two general reasons for denying a wrongful life cause of action. The first is the courts' unwillingness to hold that a plaintiff can recover damages for being alive. At heart, the reluctance of these courts is based on the "high value which the law and mankind has placed on human life, rather than its absence." *Becker v. Schwartz,* 386 N.E.2d at 812. The other rationale articulated by the courts is that, because in awarding damages the court must offset any special benefits to the plaintiff resulting from the negligence, *see Restatement (Second) of Torts* § 920 (1979), such a cause of action involves a weighing of life against non-life, a calculation that cannot rationally be made. *See Dumer v. St. Michael's Hospital,* 233 N.W.2d at 376. As Chief Justice Weintraub said in the landmark case of *Gleitman v. Cosgrove,* "[U]ltimately, the infant's complaint is that he would be better off not to have been born. Man, who knows nothing of death or nothingness, cannot possibly know whether this is so." 49 N.J. 22, 227 A.2d 689, 711 (1967) (concurring and dissenting).

In an effort to meet these objections, the highest courts in three states have adopted what might be called a limited wrongful life cause of action. In *Turpin v. Sortini,* 31 Cal.3d 220, 182 Cal.Rptr. 337, 643 P.2d 954 (1982), the Supreme Court of California held that the child could recover in his own behalf the extraordinary medical expenses not awarded to the parents. The court, recognizing that it would be impossible to measure the benefits of life against the detriments of an impaired life, refused to allow general damages to the child. The court went on to hold, however, that awarding special damages for medical expenses and training did not require the court to weigh life against non-life, and thus these special damages could be compensated. A year later, in *Harbeson v. Parke-Davis Inc.,* 98 Wash.2d 460, 656 P.2d 483 (1983), the Supreme Court of Washington reached the same result, largely based on the *Turpin* case. In *Procanik v. Cillo,* 97 N.J. 339, 478 A.2d 755 (1984), the Supreme Court of New Jersey recently joined the California and Washington courts by allowing the child to recover his extraordinary medical expenses. The parents in *Procanik* were barred from any recovery on their own behalf by the statute of limitations.

Despite the efforts of the *Turpin, Harbeson* and *Procanik* courts, we do not believe that the issue can be so easily limited. The basic rule of tort compensation is

that the plaintiff is to be put in the position that he would have been in absent the defendant's negligence. In a personal injury case, that standard requires a comparison of the condition that the plaintiff would have been in without the negligence with the plaintiff's actual condition as a result of the defendant's negligence. In this, as in all wrongful life cases, however, there is no allegation that but for the defendant's negligence the child would have had a healthy, unimpaired life. Instead, the claim is that without the doctor's negligence the plaintiff never would have been born. Thus, the cause of action unavoidably involves the relative benefits of an impaired life as opposed to no life at all. All courts, even the ones recognizing a cause of action for wrongful life, have admitted that this calculation is impossible. We do not believe that the measure of damages can be circumscribed as the California, Washington and New Jersey courts have attempted. As was said by the Michigan court in *Strohmaier*, "The special damages that are claimed cannot be considered in a vacuum separate from the reality that, but for the alleged negligence, plaintiff would not exist." 332 N.W.2d at 435. We hold that there is no cause of action in Texas for wrongful life.

Our holding is not based on a mere difficulty in assessing a dollar amount of damages. It has long been held that imprecision of damages is not a bar to recovery. *Hindman v. Texas Lime Co.*, 157 Tex. 592, 305 S.W.2d 947 (1957); *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097 (1938). But this is not just a case in which the damages evade precise measurement. Here, it is impossible to rationally decide whether the plaintiff has been damaged at all. That "is a mystery more properly to be left to the philosophers and the theologians." *Becker v. Schwartz*, 413 N.Y.S.2d 895, 386 N.E.2d at 812.

To summarize, we hold that article 5.82, section 4 of the Insurance Code as applied in this case violates the open courts provision, article I, section 13 of the Texas Constitution. We also hold that there is no cause of action in Texas for wrongful life.

The judgments of the trial court and court of appeals are reversed in part and affirmed in part. The cause is remanded for trial on the parents' cause of action.

ROBERTSON, J., files a concurring opinion.

KILGARLIN and GONZALEZ, JJ., file concurring and dissenting opinions.

WALLACE, J., files a dissenting opinion in which McGEE, J., joins.

ROBERTSON, Justice, concurring.

I concur in the result reached by the majority.

## I. WRONGFUL BIRTH

At first blush, the majority opinion appears to apply art. I, sec. 13 of the Texas Constitution in such a way as to sustain a judicial innovation, a "wrongful birth" cause of action, and strike down a well-recognized legislative prerogative, a statute of limitation. This is not the case. Rather, what we do today is sustain a well-established cause of action against a novel exercise of legislative power.

In *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975), this court first permitted the recovery by parents of the expenses necessary for the care and treatment of a child's physical impairment, when those expenses were proximately caused by negligent prenatal advice. Like many other courts, we found "wrongful birth" to be a convenient description for such a fact setting. The pleadings in *Jacobs*, however, as well as the pleadings of the Nelsons in the instant case, are couched in terms of negligence; the label in each case has been added by the courts.

This observation is neither academic nor trivial. Rather, recognition that we are dealing with nothing more nor less than the traditional elements of a negligence cause of action is pivotal to resolution of both the

"wrongful birth" and "wrongful life" facets of this appeal.[1]

It naturally follows that I cannot agree with the majority opinion's statement that "[i]n *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975), we *approved a cause of action* for 'wrongful birth,' the suit that the parents have now brought in their own behalf." 678 S.W.2d at 923 (emphasis added). Were this true, art. I, sec. 13 could not act as a constitutional bar to the application of art. 5.82, sec. 4 of the Insurance Code to the Nelsons' cause of action. This court has repeatedly stated that art. I, sec. 13 of the Texas Constitution protects "well-established common law" causes of action. *See, e.g., Sax v. Votteler,* 648 S.W.2d 661, 665 (Tex.1983); *Lebohm v. City of Galveston,* 154 Tex. 192, 275 S.W.2d 951, 955 (1955). The statute in question took effect less than four months after *Jacobs v. Theimer.* Four months cannot possibly be sufficient time for a new cause of action to become well-established at common law, to trigger the protection of the Texas Constitution. More precisely, the Nelsons' cause of action sounds in negligence and alleges medical malpractice; such a cause of action was well-established in this State long before *Jacobs v. Theimer* and fully merits the protection of art. I, sec. 13 of the Texas Constitution.

Art. 5.82, sec. 4 of the Insurance Code, although referred to as a "statute of limitation," is by no means a traditional limitation act. In fact, a number of courts and commentators have begun to differentiate between such statutes and traditional limitation acts, and would term legislation such as art. 5.82, sec. 4 a "statute of repose." *See, e.g.,* Note, *Medical Malpractice Statute of Repose: An Unconstitutional Denial of Access to the Courts,* 63 Neb.L.Rev. 150, 153 (1983); Comment, *Statutes of Repose in Products Liability: Death Before Conception,* 37 Sw.L.J. 690–2 (1983) (classifying art. 5.82, sec. 4 as a "statute of repose"). Texas courts have traditionally used the terms "limitation" and "repose" interchangeably, since one purpose of a statute of limitation is to permit repose. *See, e.g., Davis v. Howe,* 213 S.W. 609, 611 (Tex.Comm'n App.1919, judgmt adopted). The recent trend to categorize statutes as either "limitation" or "repose" is only an attempt to highlight by semantic distinction a number of very real differences in the wording, purpose, and effect of many recent limitation statutes when compared with more traditional acts.

A traditional statute of limitation is usually intended to compel a plaintiff to bring a claim to court within a reasonable period of time after the cause of action arises. Such a statute encourages diligence, and has as its primary purpose the prevention of stale claims. *Robinson v. Weaver,* 550 S.W.2d 18, 20 (Tex.1977). A "statute of repose," on the other hand, does not run from the time a cause of action arises, but from some other date or event selected by the legislature. This is so because it generally has some purpose other than encouragement of diligence on the part of plaintiffs. Art. 5.82, sec. 4, for example, was designed to promote stability in insurance rate-making. *See* Keith, *The Texas Liability and Insurance Improvement Act—A Survey and Analysis of Its History, Construction and Constitutionality,* 36 Baylor L.Rev. 265, 300–01 (1984). As a result, a "statute of repose" may operate—as in this case—to bar access to courts for the remedy of a legal wrong despite the exercise of all possible diligence by a plaintiff in prosecuting a claim.

Texas courts traditionally accord wide deference to the legislature's right to establish statutes of limitation, but even that deference has long had limits.

"The legislature may provide a shorter period of limitation for existing causes of action. It may make a statute of limitation for causes when none existed before,

---

1. Despite the fact that such labels occasionally obscure as much as they clarify, they will be used for convenience in this opinion, as they are in widespread use by courts and commentators. See discussion in *University of Ariz. Health Sciences Center v. Superior Court,* 136 Ariz. 579, 667 P.2d 1294, 1296 n.1 (1983); *Fassoulas v. Ramey,* 450 So.2d 822, 825 n. 1 (Fla.1984) (Ehrlich, J., dissenting); *Nanke v. Napier,* 346 N.W.2d 520, 521 (Iowa 1984).

*but it cannot, by so abbreviating the time in which suit must be brought, take away the right of action altogether."*

*Wright v. Hardie*, 88 Tex. 653, 32 S.W. 885, 886 (1895) (emphasis added). When a statute, whether it be termed one of "limitation" or of "repose," eliminates a plaintiff's access to the courts for redress of an injury, despite the exercise of all possible diligence, it is susceptible to constitutional challenge under art. I, sec. 13 of the Texas Constitution.

In the case at bar, the constitutional analysis is not difficult. This court need look no further than *Sax v. Votteler*, 648 S.W.2d 661 (Tex.1983), a decision scarcely one year old, involving the same statutory provision, the same constitutional challenge, and decided by a unanimous court.

*Sax* set forth a two-pronged test for the constitutionality of a statute challenged as violating the Texas "Open Courts" provision. The first question is whether the litigant has a "cognizable cause of action that is being restricted." *Sax*, 648 S.W.2d at 666. Lori Beth Sax' cause of action in negligence for medical malpractice was sufficient to invoke the protection of the Texas Constitution; the Nelsons' cause of action is of the same nature and so deserves the same protection.

The second prong requires the court to balance the purpose and basis of the statute against the restriction on the litigant's rights. *Id.* This court recognized a legitimate legislative purpose for art. 5.82, sec. 4 of the Insurance Code in *Sax*, 648 S.W.2d at 667; the point requires no further discussion.

In determining the extent of the restriction on a litigant's rights, a court must not examine the effect of the challenged statute in isolation. The legislature can avoid an otherwise unconstitutional result by providing a substitute remedy, *Lebohm v. City of Galveston*, 154 Tex. 192, 275 S.W.2d 951, 955 (1955), or by leaving a reasonable alternative at common law. *Sax*, 648 S.W.2d at 667.

In *Sax*, this court noted that the effect of the statute was to deny a minor plaintiff a remedy for a well-established common law wrong. Lori Beth Sax was prohibited by law from bringing suit on her own behalf during her minority, and was barred from suit upon coming of age by the language of art. 5.82, sec. 4. This court noted and rejected the alternative of a suit by parents on the child's behalf, reasoning that this did not provide adequate protection for the child's rights. *Sax*, 648 S.W.2d at 667. The statute was therefore unconstitutional, so far as it affected a minor plaintiff.

The parents' cause of action in *Sax* stood on a different footing. Nothing prohibited them from suing on a known cause of action during the two years permitted by statute. The two-year period thus presented a reasonable alternative for the parents, and art. 5.82, sec. 4 was not unconstitutional as it applied to them.

In *Sax*, this court was not called upon to decide the constitutionality of the two-year provision as applied to an adult who—due to the undiscoverable nature of a medical problem—could not have brought suit within the statutory period. The answer is nonetheless clear. The restriction upon the rights of the Nelsons in this case are at least as severe as those upon the minor plaintiff in *Sax*. Lori Beth Sax was prohibited by statute from bringing suit even had she acted with utmost diligence at her first practical opportunity, the age of majority. The Nelsons were prohibited by the same statute from bringing suit even had they acted with utmost diligence at their first practical opportunity, discovery of the injury.

There is only one distinction between *Sax* and the instant case. Lori Beth Sax had an alternative, the possibility of suit by her parents on her behalf. That alternative was held to be inadequate to protect her rights. The Nelsons have no alternative, under the facts of this case. If art. 5.82, sec. 4 was unconstitutional as applied to Lori Beth Sax, it must equally be held unconstitutional here. As one student commentator has recently noted:

"The effect of this restriction, like that on a minor's cause of action in *Sax*, is not merely to place an outside limit on when a cause of action may be brought. Instead, it eliminates the right to bring a legal action. It is unreasonable to assert that this class of litigants must be sacrificed for lower malpractice rates. They, as much as any other victims of malpractice, are entitled to their day in court. *Sax* opens the courthouse doors for minors who were left unprotected by the statute. Its reasoning should ultimately do the same for injured parties who are prevented from bringing their claim because they could not discover the injury within the two-year limitation period."

Note, *Sax v. Votteler*, 21 Hous.L.Rev. 295, 309 (1984).

Since *Sax v. Votteler* controls this case, I find it unnecessary to decide the issue of whether art. 5.82, sec. 4 has legislatively abolished the "discovery rule." While this might well have been the legislature's intent, the initial question should be whether, considering the language of the statute itself, the legislature has in fact done so. I would reserve that question for an appropriate case.

## II. WRONGFUL LIFE

Like the majority, I decline to recognize a legally cognizable claim in negligence for "wrongful life." I differ, however, with the emphasis of the majority opinion. I would place no reliance whatever on a public policy placing a "high value ... on human life, rather than its absence," 678 S.W.2d at 924, as courts are not equipped to place a value on non-existence. Nor do I feel that the difficulty of assessing or calculating damages deserves any consideration as a reason for declining to permit a "wrongful life" claim. It is well settled that

"There is ... no general requirement that the injured person should prove with

... definiteness the extent of harm that he has suffered as a result of the tortfeasor's conduct. It is desirable ... that there be definiteness of proof of the amount of damage as far as is reasonably possible. It is even more desirable, however, that an injured person not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of the harm he has suffered."

Restatement (Second) of Torts § 912, comment a (1979).[2]

The reason for permitting the Nelsons a cause of action, but denying a similar cause of action to their son is simple: the claim of the parents arguably contains all the elements for a prima facie case in negligence; the claim of the child does not.

Viewing Dr. Krusen's alleged conduct from the standpoint of the parents, under the summary judgment evidence and pleadings a viable suit in negligence is presented. The elements of actionable negligence are duty, a breach of that duty, an injury to the person owed the duty, and proximate cause. *Pullman Co. v. Caviness*, 53 Tex. Civ.App. 540, 116 S.W. 410 (1909, writ ref'd). The duty to give accurate medical advice runs from the doctor to the patient. That duty was arguably breached. Since the parents allege that they would have sought an abortion had they known Mrs. Nelson was a genetic carrier of Duchenne muscular dystrophy, proximate cause must be presumed. The injury consists of medical bills that would not have been incurred by the parents, but for the birth of Mark Nelson.

The "wrongful life" cause of action must be viewed from a different perspective, that of the child. With the child as a plaintiff, a suit in negligence is difficult to conceptualize. Courts examining "wrongful life" suits have had difficulty with virtually every element of the cause of action—the nature of the duty, if any, owed

---

**2.** For a similar reason, Restatement (Second) of Torts § 920 (1979) is irrelevant to my decision. Sec. 920 applies only when calculating damage awards; it presupposes that the plaintiff has

established the element of harm. Since a "wrongful life" plaintiff cannot meet this initial burden, § 920 principles need never be considered.

to an unborn child under these circumstances, the concomitant question of breach, and the issue of proximate cause in a situation where both the child's life and his or her defective condition are due to the same negligent act.

I am most concerned by the element of injury. We cannot compare Mark Nelson's current condition, life as a victim of muscular dystrophy, with the alternative of a normal, healthy childhood. Were this so, the fact of injury would not be in issue, and the sole question would be the calculation of the extent of damages. Under the summary judgment evidence, the same medical advice that was the proximate cause of his affliction must be assumed to be the cause of his life itself. To determine whether Mark Nelson has suffered an injury in fact, then, his life with physical impairment must be compared to the alternative of nonexistence.

This calculation cannot rationally be made, as man knows nothing of nonexistence, and can assign it neither a positive nor a negative value. Unfortunately, the fact of injury is a prima facie element in a cause of action for negligence. *Johnson v. Sovereign Camp, W.O.W.*, 125 Tex. 329, 83 S.W.2d 605 (1935). It is not fatal to a cause of action in negligence that a plaintiff cannot prove the *quantum* of injury; but a plaintiff must always establish the *existence* of injury. This is an impossible burden for a "wrongful life" plaintiff to meet. Since the initial burden of proof of each element of a negligence cause of action is upon the plaintiff, and one element is rationally unprovable in a "wrongful life" setting, a negligence suit cannot be maintained. The absence of any injury in fact is also a primary factor in the refusal of New York courts to recognize a "wrongful life" cause of action. *See, e.g., Becker v. Schwartz*, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 900, 386 N.E.2d 807 (1978); *Alquijay v. St. Luke's-Roosevelt Hospital Center*, 99 A.D.2d 704, 472 N.Y.S.2d 2, 3 (1984).

There is no inconsistency between permitting a cause of action for the parents, but not for the child. The difference is the identity of the parties. For the parents, the alternatives to be considered in determining whether there has been any injury in fact are no child, and no medical expenses, or a child with physical impairment resulting in medical expenses the parents are obligated to pay. The fact of injury is apparent. For the child, though, the alternatives are existence in an impaired state, or nonexistence. The fact of injury is not only not apparent, but unknowable.

The distinction between the parents' and child's cause of action has also been explained in a somewhat different fashion:

"When the plaintiff alleges that his own birth was wrongful, in effect he asks the court to judicially determine that he should not have been allowed to live, but when another person such as a parent alleges that the infant should not have been born, the parent does not seek to negate his own present existence. *The parent is in reality seeking damages for injuries causally related to the fact of birth, but not for the birth itself.* Thus, the parents are not placed in the anomalous position of trying to sue themselves into oblivion, as are the children."

Comment, *Wrongful Birth: The Emerging Status of a New Tort*, 8 St. Mary's L.J. 140, 145 (1976) (emphasis added).

It is worth noting that most other jurisdictions make the same distinction as this court makes today, finding no logical inconsistency between permitting a cause of action for the parents, but not for children. As the Supreme Court of Georgia observed earlier this year:

"An action brought by a child against the parents or physician on the theory that because of his illegitimacy or birth defects he would have been better not born has found almost no support in the law. However, most jurisdictions now allow an action by parents against the physician for wrongful pregnancy or wrongful conception."

*Fulton-DeKalb Hospital Authority v. Graves*, 252 Ga. 441, 314 S.E.2d 653, 654 (1984); *see also* Annot., 83 A.L.R.3d 15

(1978). In at least three leading decisions, a cause of action for the parents has been permitted, but a similar cause of action for the child denied in the same decision. *See Becker v. Schwartz*, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978); *Speck v. Finegold*, 268 Pa.Super. 342, 408 A.2d 496 (1979), *aff'd in part, rev'd in part*, 497 Pa. 77, 439 A.2d 110 (1981); *Dumer v. St. Michael's Hospital*, 69 Wis.2d 766, 233 N.W.2d 372 (1975).

Recently, California and Washington courts have permitted a limited right of recovery for a child presenting a "wrongful life" claim. *See Turpin v. Sortini*, 31 Cal.3d 220, 643 P.2d 954, 182 Cal.Rptr. 337 (1982); *Harbeson v. Parke-Davis, Inc.*, 98 Wash.2d 460, 656 P.2d 483 (1983). Even more recently, New Jersey has approved the same result—permitting a child's recovery of extraordinary medical expenses—albiet on a different rationale. *Procanik v. Cillo*, 97 N.J. 339, 478 A.2d 755 (1984). It is tempting to join these courts in fashioning some relief for a severely handicapped child, when that child may be burdened with crushing medical expenses for the remainder of his natural life.

A court should not, however, discard established principles of tort law sub silentio in an attempt to reach a "right" result. Close examination of the California and Washington opinions reveals such an unexplained gap in the decisional reasoning.

The California Supreme Court distinguished between general and special damages in a "wrongful life" setting, denying the former, yet permitting the latter. Explaining why general damages could not be assessed, the *Turpin* court observed that "the problem is not ... simply the fixing of damages for a conceded injury, but the threshold question of determining whether the plaintiff has in fact suffered an injury by being born with an ailment as opposed to not being born at all." 643 P.2d at 963.

The court also noted that "it is simply impossible to determine in any rational or reasoned fashion whether the plaintiff has in fact suffered an injury in being born impaired rather than not being born." *Id.*

Thus, the California Supreme Court, in denying general damages, seems to have explicitly conceded that a prima facie element of the tort was not established. In deciding to award special damages, however, the *Turpin* court ignored the reasoning that prevented an award of general damages. The problem of establishing the fact of injury was simply passed over, and all discussion focused on the nonspeculative nature of a recovery for medical expenses.

The Washington decision suffers from the same logical weakness. In *Harbeson v. Parke-Davis Inc.*, 98 Wash.2d 460, 656 P. 2d 483 (1983), the Supreme Court of Washington adopted both the "wrongful birth" and "wrongful life" positions. The decision was explicitly treated as a negligence action, and the Washington court was at pains to place both theories in the traditional negligence framework, discussing each of the four elements of negligence in turn for both "wrongful birth" and "wrongful life."

The Washington Supreme Court acknowledged that "[t]he most controversial element of the [wrongful life] analysis in other jurisdictions has been injury and the extent of damages," and conceded that "measuring the value of an impaired life as compared to nonexistence is a task that is beyond mere mortals, whether judges or jurors." *Harbeson*, 656 P.2d at 496. Nonetheless, the Washington Supreme Court simply proceeded to a discussion of the calculation of damages, without explanation of how the difficulty in determining the existence of the element of injury had been overcome.[3]

---

**3.** The failure of the California and Washington courts to establish the logical basis for a "wrongful life" action—the existence of harm or injury—has not escaped the attention of commentators. With reference to the California decision in *Turpin*, it has been observed that "[t]he

court's unsuccessful attempts to justify an award of special damages betray its failure to appreciate fully the fundamental flaw of a wrongful life claim. No wrongful life plaintiff, even with severe defects, can prove she has suffered harm, and the obstacle is not merely

A recent decision, *Procanik v. Cillo*, 97 N.J. 339, 478 A.2d 755 (1984), deserves particular attention, inasmuch as an earlier New Jersey case, *Gleitman v. Cosgrove*, 49 N.J. 22, 227 A.2d 689 (1967), was widely recognized as a leading decision on the "wrongful life" issue. Like California and Washington, the New Jersey Supreme Court recognized in denying a claim for general damages that "[t]he crux of the problem is that there is no rational way to measure nonexistence." *Procanik*, 478 A.2d at 763.

Nonetheless, the New Jersey court awarded special damages. The reasoning of the court is explicit. Quoting a dissenting opinion in *Gleitman*, the New Jersey court observed that "while logical objection may be advanced to the child's standing and injury, logic is not the determinative factor ...." *Procanik*, 478 A.2d at 762. The court added: "Whatever logic inheres in permitting parents to recover for the cost of extraordinary medical care incurred by a birth-defective child, but in denying the child's own right to recover those expenses, must yield to the inherent injustice of that result." *Id.* 478 A.2d at 762. The conclusion is clear:

> "We need not become preoccupied ... with ... metaphysical considerations. Our decision to allow the recovery of extraordinary medical expenses is not premised on the concept that non-life is preferable to an impaired life, but is predicated on the needs of the living. We seek only to respond to the call of the living for help in bearing the burden of their affliction."

*Id.* 478 A.2d at 763.

While the sentiments of the New Jersey. court may be laudable, this court is pre-cluded from reaching such a result. To reiterate, the pleadings and briefs of plaintiffs in this case are based in negligence. While this court is not adverse to reexamining and modifying traditional negligence concepts to meet changing social needs, *see Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307 (Tex.1983), it is properly unwilling to take the step required by a "wrongful life" plaintiff: complete *waiver* of the requirement of injury in a negligence cause of action. Once such a step is taken, it is difficult to envision any principled basis for refusing to extend the reasoning to other elements and other situations.

This court neither addresses nor decides the question of whether some day, under some different theory, a plaintiff might prevail under similar facts. "New and nameless torts are being recognized constantly, and the progress of the common law is marked by many cases of first impression, in which the court has struck out boldly to create a new cause of action, where none has been recognized before." W. Prosser and W. Keeton, *The Law of Torts* § 1 (5th ed. 1984). The claim of Mark Nelson, however, simply fails to state a cause of action in negligence and must be denied.

KILGARLIN, Justice, concurring and dissenting.

I concur with that part of the majority opinion which would reverse the judgments of the courts below and remand Tom and Gloria Nelson's cause of action to the trial court. However, I respectfully dissent from that portion of the majority opinion which declines to recognize Mark Nelson's claim for medical expenses and special

---

that damage calculations are speculative. The court acknowledged this fact, yet reached an inconsistent result. No damages of any kind can be awarded because it is impossible to know if the plaintiff is worse off as a result of the defendant's negligence." Note, *Turpin v. Sortini: Recognizing the Unsupportable Cause of Action for Wrongful Life,* 71 Cal.L.Rev. 1278, 1292–93 (1983).

Likewise, *Harbeson v. Parke-Davis, Inc.* has drawn justified criticism because the Wash-ington court's "logic does not support its conclusions. It failed to demonstrate that birth with defects is an injury to the child. Because this essential premise is unsupported, no duty to the child should be imposed on the physician to prevent the child's birth with defects, and no damages for wrongful life should be allowed to compensate for the unproven injury." Note, *Washington Recognizes Wrongful Birth and Wrongful Life—A Critical Analysis,* 58 Wash.L. Rev. 649, 677–78 (1983).

training which he may reasonably incur after age eighteen. The holding in *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975), would support Mark's cause of action if damages were limited to "[t]he economic burden related solely to the physical defects of the child." *Id.* at 849. The life versus nonlife question posed by the majority should not preclude Mark, after he attains majority, from recovering medical and other expenses which "lie within the methods of proof by which the courts are accustomed to determine awards in personal injury cases. No public policy obstacle should be interposed to that recovery." *Id.*

In reality, the court's decision denying Mark's right to a negligence claim is contrary to fundamental policies and principles that have become the basis of tort law. Originally, forms of actions were rigidly prescribed, and the plaintiff had no cause of action unless he could fit his claim "into the form of some existing and recognized writ." Prosser, *Law of Torts* § 4 at 19 (4th ed. 1971). Since that small beginning about 150 years ago, tort law has become a dynamic and flexible system of law designed to properly allocate losses that arise out of human activities.

"The entire history of tort law shows a continuous tendency to recognize as worthy of legal protection interests which previously were not protected at all." *Restatement (Second) of Torts* § 1 comment e (1965). Although tort law's primary purpose is compensation for wronged plaintiffs, that has never been its only goal. Courts have always sought to reflect and adapt to changes in society acting to balance both individual and societal interests. Our courts have always recognized and used tort law's unique ability to deter wrongdoing as a means of social policy. *Restatement (Second) of Torts* § 901 (1965). This concept has in fact become a part of Texas law. *See McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.1967) (recognition of strict products liability); *Leal v. C.C. Pitts Sand & Gravel, Inc.*, 419 S.W.2d 820 (Tex.1967) (an unborn child can recover); *Otis Engineering Corp. v. Clark*, 668 S.W.2d 307 (Tex.1983) (employer

held potentially liable for negligence of drunken off-duty employee).

Today we are confronted with the compelling responsibility of imposing legal accountability upon an aspect of medicine that is rapidly becoming a predominant social force. Genetic knowledge and expertise have increased as fast as any other medical specialty in the last ten years. Estimates now indicate that 12 million Americans suffer a type of genetic disease. *See* H.R.Rep. No. 498, 94th Cong., 1st Sess. 18–19 (1975) reprinted in [1976] U.S.Code Cong. & Ad.News 709, 726–27. Over 40% of all childhood diseases are caused partly by genetic factors. Day & Holmes, *The Incident of Genetic Disease in a University Hospital Population*, 25 Am.J.Human Genetics 237 (1973). Downs' Syndrome alone costs society $1.7 billion dollars. House Report at 727. The ability to predict genetic disorders prior to birth has improved to the extent that at least 66 different genetic diseases are presently diagnosable prior to birth. Milunsky, *Genetics and The Law*, 54 (1976).

Despite the rapidly expanding impact of genetic knowledge upon our society, the law has failed to keep pace. Capron, *Tort Liability in Genetic Counseling*, 79 Colum.L.Rev. 618 (1979). Although today's society is not the genetically controlled one anticipated in Aldous Huxley's *Brave New World*, a doctor's power to control genetic information, without restraint, may have subtle, far-reaching and devastating effects on family planning. Only by assuring a doctor's legal accountability can we guard against an abuse of such power.

The decision to have children is fundamental to the very existence of a family. Mark Nelson as a practical matter could not make that decision for himself. The right to make that decision belongs to no one other than his parents. Yet that right is only meaningful if it is an informed decision. The right to an informed decision with regard to future offspring emphasizes the need for legal safeguards in this area. The majority opinion, by refusing to impose

more than limited responsibility for negligent genetic counseling, fails to keep the law abreast of burgeoning knowledge and does not provide needed legal accountability. The court's inaction today merely postpones the necessity of acting in a medical area that will increasingly dominate our society. Moreover, the court entirely overlooks the real victim of the malpractice, Mark Nelson. Because the court allows recovery only when a child's parents are both willing and capable of bringing a timely suit, a child potentially will receive no redress at all. In *Sax v. Votteler*, 648 S.W.2d 661 (Tex.1983), although we allowed Lori Beth Sax a claim in her own right, the parents, by waiting too long to bring suit, were denied recovery. Similarly, had the Nelsons waited more than two years after discovering Mark's condition, Mark's defects would go uncompensated, for he, unlike Lori Beth Sax, is denied a cause of action. This is exactly what would have happened had the court in *Procanik v. Cillo*, 97 N.J. 339, 478 A.2d 755 (1984), not allowed the minor a wrongful life claim. There, Peter Procanik's parents allowed limitations to run on their wrongful birth cause, and thus were denied recovery in their individual capacities.

No difficulty is created by permitting Mark to allege common law negligence. In a genetic malpractice or wrongful life action, the genetically impaired child alleges that the negligence of the physician or other genetic counselor, by failing to inform his parents of the risk of giving birth to an impaired child, caused his birth. Comment, *"Wrongful Life": The Right Not To Be Born*, 54 Tul.L.Rev. 480, 485 (1980); *Harbeson v. Parke-Davis*, 656 P.2d 483, 494 (Wash.1983). The cause may be determined by using the traditional negligence elements of duty, breach of duty, proximate cause and damages. *Turpin v. Sortini*, 31 Cal.3d 220, 643 P.2d 954, 965, 182 Cal.Rptr. 337, 348 (1982). Thus, this action is merely a form of medical malpractice. *Turpin*, 182 Cal.Rptr. at 342, 643 P.2d at 959; *Harbeson*, 656 P.2d at 495.

Mark alleges Dr. Krusen had a duty to provide the Nelsons with accurate informa-

tion to enable them to make an informed decision of whether to give birth to Mark and that this duty flowed directly to him. I agree. But more importantly, neither Dr. Krusen nor the hospital deny that this duty was owed. This duty is within the Texas rule that a physician must properly inform a patient. *See Roark v. Allen*, 633 S.W.2d 804 (Tex.1982); *Wilson v. Scott*, 412 S.W.2d 299 (Tex.1967). It was foreseeable that Mark's parents would rely upon the information provided by Dr. Krusen in deciding whether it would be in Mark's best interest to be born with Duchenne muscular dystrophy since Mark was unable to make this decision. Their right to make such a decision is currently the law. *Jacobs*, 519 S.W.2d at 848. The failure to provide the Nelsons with correct information was a breach of duty owed directly to Mark. *See, e.g., Turpin*, 182 Cal.Rptr. at 339, 643 P.2d at 956; *Harbeson*, 656 P.2d at 496. The judgment of a parent or guardian may be substituted for that of the child when the child is incompetent and unable to decide whether he prefers nonlife to an impaired existence. *In the Matter of Quinlan*, 70 N.J. 10, 355 A.2d 647 (1976); *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417 (1977).

However, merely because a child is born in an impaired condition does not mean that the physician has breached this duty. His conduct must be measured against the degree of skill, care and knowledge possessed and exercised by others engaged in genetic counseling. The child must show by affirmative proof that the defendant did not meet this standard.

In a genetic malpractice action, the child must prove not that the defendant's negligence caused his injuries but that it caused his birth. The child, like his parents in a wrongful birth action, must show that but for the defendant's negligence in adequately detecting and/or informing his parents of his condition or of the risk, he would never have been born. Note, *Wrongful Life: Should The Cause Of Action Be Recognized*, 70 Ky.L.J. 163, 177–78 (1982);

Comment, *"Wrongful Life": The Right Not To Be Born, supra,* at 485. The child, like his parents, must prove that had his parents been provided with accurate information relating to the risk, they would have prevented his birth. In this case there is no difficulty in showing causation. The Nelsons consulted Dr. Krusen, after Mark's conception, for the specific purpose of determining whether Mrs. Nelson was a carrier of the disease. After being informed that she was no more likely to have another child afflicted with muscular dystrophy than any other female, the pregnancy was permitted to continue and Mark was born with muscular dystrophy.

The majority opinion does not deny that Dr. Krusen owed a duty to Mark through his parents. Nor does the majority object to Mark's ability to prove either breach of that duty or proximate cause. Instead, the majority argues that as a matter of law, Mark is unable to prove injury, because in weighing life against nonlife, "it is impossible to rationally decide whether the plaintiff has been damaged at all."

Nonetheless, in reaching the decision that Mark can never prove injury, the majority has impliedly held that in a court of law, life, however defective, is preferable to nonexistence, a thing the majority contends is incapable of measurement. To reach this value decision, the court has relied upon case law resting on the "high value which the law and mankind has placed on human life, rather than its absence. *Becker v. Schwartz,* 413 N.Y.S.2d 895, 386 N.E.2d at 812."

Our decision in *Jacobs v. Theimer* and the decision today allow parents to recover for the "wrongful birth" of their child. By necessity this claim also requires a choice between competing values. A jury considers the intangible benefits of having a child, regardless of the child's defects, a measure of life versus nonlife. It is difficult to understand why the court allows recovery for the parents but not the child—why life versus nonlife is capable of measurement in one instance but not the other.

The absurdity of distinguishing between the two claims also is demonstrated by the practical effect of awarding damages to the parents. Since the child will be the real, if not formal, beneficiary of the parents' recovery for health care and other expenses, any remaining difficulty in allowing claims directly on behalf of an affected child seems shortsighted, especially if it is based on metaphysical refinements. *See* Capron, *supra,* at 639. Limiting recovery to the parents creates additional conceptual and legal problems. Because expenses in such cases were proximately caused by the doctor's negligence, denial of Mark's claim improperly allocates costs. Since the child is permitted no claim, unlike other suits brought by parents on behalf of their children, the child is not protected by a trust. Nor is the recovery placed in the registry of the court. Because some parents will be either unable or unwilling to support their child after adulthood, the child should have an "independent recovery to cover his extra costs of living with a genetic defect." Comment, *A Preference for Non-Existence: Wrongful Life to a Proposed Tort of Genetic Malpractice,* 55 S.Cal.L.Rev. 477, 500 (1982). If a child is left without parents, the costs for support will be borne by someone else, often the state. Denial of a wrongful life claim could allow a doctor to be a wrongdoer without requiring him to compensate the person wronged most. As such, the court's action not only undermines a primary purpose of tort law, but it also weakens another policy, the deterrent function of imposing liability. Prosser, *supra,* § 4 at 23. *See also* Calabresi, *The Costs of Accidents* 73–75 (1970).

Finally, it must be noted that other courts have awarded special damages to children in Mark's condition. *See Turpin v. Sortini,* 182 Cal.Rptr. at 337, 643 P.2d at 954; *Harbeson v. Parke-Davis, Inc.,* 656 P.2d at 483. In awarding special damages, courts recognizing a suit based upon genetic malpractice have not found it necessary to resolve questions comparing life to nonlife. *Procanik v. Cillo; Woodruf v. Hoffman,* Conn.Supp. (1983).

In conclusion, recognition of Mark's claim would be consistent with the social objectives of preventing malpractice in genetic and prenatal counseling and act as a deterrent to negligent conduct. *Harbeson*, 656 P.2d at 496; *Turpin*, 182 Cal.Rptr. at 348, n. 15, 643 P.2d at 965, n. 15. Such a decision would place nonlife/life decisions in the proper hands, those of Mark's parents. Because genetic malpractice or wrongful life is a cognizable cause of action under Texas common law, the judgment of the court of appeals should in all things be reversed.

GONZALEZ, Justice, concurring and dissenting.

I concur with the holding of the majority that the statute of limitations in Tex.Ins. Code Ann. art. 5.82 § 4 (currently Tex.Rev. Civ.Stat.Ann. art. 4590i § 10.01) is unconstitutional because of its violation of Tex. Const. art. I, § 13. I also agree with the court's holding that Mark has no cause of action for "wrongful life." Moreover, for the reasons stated in Justice Wallace's dissenting opinion, I agree that Mark's parents have no cause of action for his "wrongful birth." I respectfully dissent from this portion of the majority opinion.

This case presents some very difficult questions, both moral and legal. When courts are forced to contend with issues involving life and death such as those presented in this case, a merger of our concepts of morality and law is unavoidable.

Since the United States Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), we have witnessed a tremendous increase in the number of abortions in this country, all in the name of "free choice" or the "right of privacy." Under this social policy, a parent or parents of a child are free to abort their child during the first trimester of pregnancy for any or no reason. This policy has contributed to a "disposable society." If we do not like something, we get rid of it. Often, in abortions, this is done without regard for the sanctity of life.

Parents should not be given a legal entitlement to a perfect child. By recognizing the right of Mark's parents to abort him prior to his birth or the right to sue the doctor and the hospital for damages due to his birth, the majority of the court approaches this entitlement. It is my hope that the courts and legislatures of this nation, and our society, will continue to ponder the meaning and value of life, even that of those yet unborn. Through this process of reflection and discussion, hopefully the pendulum of public opinion will swing toward the recognition of the rights of the unborn.

I too would overrule *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975.) I would affirm the judgment of the courts below holding that the Nelsons should take nothing.

WALLACE, Justice, dissenting.

I respectfully dissent from the court's opinion. It is not necessary for us to reach the question of whether TEX.INS.CODE ANN. art. 5.82 § 4 (1975) (now TEX.REV. CIV.STAT.ANN. art. 4590i § 10.01) (Vernon's Supp.1984) is unconstitutional because all issues can be disposed of on other grounds.

The court's opinion is inconsistent in holding that the parents have a cause of action for wrongful birth but that the child does not have a cause of action for wrongful life. The court's opinion is merely using the labels of "wrongful life" and "wrongful birth," the meaning of which is the same, in an attempt to differentiate truly identical causes of action; one which is brought by the parents, and the other which is brought by the child. On the one hand the court is saying that the child has no cause of action for wrongful life based upon the public policy that life, in whatever condition, is more valuable than non-life. On the other hand, the court does an about-face and holds that the parents have a cause of action for wrongful birth. In so doing, the court ignores the logical extension of its prior statement that courts are unable to make a comparison between life in whatever condition as opposed to non-

life. If that is true, it must follow that the courts are in no better position to determine if the parents are better off with a child with physical defects requiring medical expense than with no child at all.

I would overrule *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975).

I would affirm the judgments of the courts below holding that the Plaintiffs Tom L. Nelson et al. take nothing.

McGEE, J., joins in this dissent.