William O. WHEAT and Freda Barlow, Individually and as Heirs to the Estate of Shilla Wheat; Shilla Malette Aaron, Individually and as an Heir to the Estate of Shilla Wheat, By and Through Her Next Friend, Sam M. Aaron; and Albert and Catherine Harper

v.

The UNITED STATES of America et al.

Civ. No. A–83–CA–423.

United States District Court, W.D. Texas, Austin Division.

Feb. 21, 1986.

William O. Whitehurst, Jr., Kidd, Whitehurst, Harkness, Austin, Tex., for plaintiffs.

Gordon D. Laws, Asst. U.S. Atty., San Antonio, Tex., for the U.S.

Bob Burleson, Bowmer, Courtney, Burleson, Pemberton & Normand, Temple, Tex., for Dr. Harold L. Wood.

## ORDER

NOWLIN, District Judge.

The Plaintiffs in this case are Mr. William O. Wheat, individually and as community survivor, surviving spouse, and the heir-at-law of Ms. Shilla Wheat; Freda Joyce (Barlow) Watson, individually and as an heir-at-law of Shilla Wheat, Deceased; Shilla Malette Aaron, a minor, and the younger daughter of Shilla Wheat, Deceased; by and through her natural father and legal custodian, Sam M. Aaron, as her next friend, and Shilla Wheat's parents, Albert and Catherine Harper. The case was tried in November, 1985, against two Defendants, the United States of America and Dr. Harold L. Wood. The United States is sued under the Federal Torts Claim Act, 28 U.S.C. § 2671 *et seq.* This Court has jurisdiction under the provisions of 28 U.S.C. § 1346(b). The Plaintiffs are citizens of California and Arkansas, and Dr. Wood is a citizen of Texas. Therefore, this Court had jurisdiction over the parties under diversity of citizenship, 28 U.S.C. § 1332. The Court's Findings of Fact and Conclusions of Law are incorporated into the opinion.

The trial ended before the jury was charged or deliberated. Plaintiffs settled with Dr. Wood as to all of their claims against him. The claims of the Plaintiffs

against the United States now are before this Court. The suit involves claims by the Plaintiffs that the medical and surgical care that was furnished by Dr. Wood and the U.S. Army to Shilla Wheat was so inadequate as to be negligent. This case was painful for the Court to hear since the testimony and evidence introduced reveals that a human life was squandered because of the blatant negligence of several Army physicians, and the intentional actions of Dr. Wood.

Briefly, the deceased, Shilla Wheat, was treated in June, 1978, at Darnall Army Hospital, Fort Hood, Texas, for severe menstrual cramps and other related problems. The Army physicians, after a cursory medical examination, diagnosed early menopause. Later, she visited the offices of Dr. Wood, and in September, 1979, Dr. Wood performed a hysterectomy on the Plaintiff at Metroplex Hospital, Killeen, Texas. Shilla Wheat's symptoms did not cease after the operation. Within one week of the operation, Dr. Wood knew, or should have known from pathology reports from the surgery that Shilla Wheat was suffering from cancer of the cervix. Dr. Wood continued to attend to Shilla Wheat, but he never informed her or any member of her family that she was suffering from cancer. He did note the cancer in his medical notes, but that would accomplish nothing in terms of his patient, Shilla Wheat. Throughout 1979 and 1980, Shilla Wheat returned to see Army physicians on more than two dozen separate occasions. She sought medical care at Brooke Army Medical Center in San Antonio, Texas, and at Darnall Army Hospital. She complained of vaginal and rectal bleeding and rectal pain that was radiating into her lower back and her legs. The treatment given her by the Army physicians was mostly in the form of prescription narcotics and suggestions that she visit a psychiatrist. In March, 1981, Shilla Wheat collapsed as a result of severe renal failure and cardiac arrest. For the first time, Plaintiffs were informed by physicians at the Metroplex Hospital that Shilla Wheat was suffering from cancer. Shilla Wheat was to linger on for one more year, withering away with each passing month. She died on March 10, 1982.

Shilla Wheat's family brought this suit to recover for the pain, suffering, and mental anguish that Shilla Wheat suffered prior to her wrongful death. The members of her family also claim that they have damages from their pain and suffering and mental anguish throughout the sad course of events as Shilla Wheat slowly died. There is no question that the negligence of the physicians involved caused Shilla Wheat's untimely death; and a great deal of unnecessary pain and suffering. Plaintiffs claim damages pursuant to TEX.REV.CIV.STAT. ANN. art. 4671, *et seq.* [now TEX.CIV. PRAC. & REMEDIES CODE §§ 71.001–71.011 (Vernon 1985)] for the interruption of the family relationship and loss of companionship, society, affection, consortium, financial contributions and wrongful death. Plaintiffs also seek damages pursuant to TEX.REV.CIV.STAT.ANN. art. 5525 (Vernon 1958), the Texas Survival Death Statute [now TEX.CIV.PRAC. & REMEDIES CODE § 71.021 (Vernon 1985)]. Plaintiffs also claim that they will suffer damages in the future. Dr. Wood's actions were reprehensible, they caused tremendous pain and suffering, and were a proximate cause of Shilla Wheat's death. The question that remains is whether the United States is also liable for damages to Plaintiffs.

The United States responds that their physicians and medical staff exercised reasonable care in treating Shilla Wheat and in conducting medical diagnostic examinations. They focus the blame solely on Dr. Wood. The United States' claim, reduced to its most basic elements, is that by the time Shilla Wheat was treated by the United States physicians, it was too late to save her. Even if they misdiagnosed the cancer they argue, the cancer had already progressed too far to be treated. The Court believes that Shilla Wheat and her family's extensive pain, suffering and anguish, and her death, were directly and proximately caused by the negligence and malpractice of United States Army personnel and physicians. Those physicians and personnel

failed to even diagnose, much less properly treat the deadly carcinoma. The sins of Dr. Wood are now beyond this Court's powers of retribution, but the Court believes and herein finds that Dr. Wood also was negligent in his grossly inadequate medical treatment of Shilla Wheat's carcinoma; this was amplified by his failure to relay information necessary to Shilla Wheat or her family so that she could have acquired medical treatment to save herself from the ravaging cancer in her body. As a direct consequence of the negligence on the part of all of the Defendants, this Court will award damages against the United States under the Federal Torts Claim Act. The Court is of the opinion that the responsibility for the injuries to Plaintiffs and Shilla Wheat must be shared equally between the United States and Dr. Wood. In other words, 50% of the damages must be assessed against each of the Defendants. Plaintiff has settled with Dr. Wood. Under Texas law, if this were entirely a jury trial, either the Plaintiff or the non-settling Defendants could elect that the negligence of the settling Defendant be submitted to the jury. In this case, Plaintiffs desire the Court to determine the negligence of both parties. The Court now enters its opinion as follows:

### Medical Treatment By the Army

In 1978, Shilla Wheat was thirty-seven. On May 1, 1978, she went into the Darnall medical facilities at U.S. Darnall Hospital, Fort Hood, Texas. She informed the physician on duty that she had been taking birth control pills for six years to control an irregular menstrual cycle. A pap smear was taken. The cytology examination revealed minimal dysplasia which is a possible pre-malignant change in which the cells examined were abnormal. A reasonably prudent gynecologist would have been alerted to the possibility of cancer. Tests should have been ordered to determine if cancer was present. The Court believes that the proper standard of medical care in Central Texas in 1978 required that a repeat pap smear be taken within three months. The Army physician recommended that Shilla Wheat receive a repeat

pap smear in six months. On June 26, 1978, Shilla Wheat sought treatment at Darnall Army Hospital complaining of heavy menstrual bleeding, a painful pelvis, painful intercourse and an unusual, white, jelly-like discharge. Shilla Wheat was referred to the OB/GYN clinic on the Post. She informed the physician of her symptoms. Plaintiffs introduced through their medical expert, Dr. Tad Davis, a note taken from the gynecology clinic from June 20, 1978. The note indicates Shilla Wheat had given her symptoms as unusually prolonged bleeding for one month, with blood clots. She told the physicians that she had been on birth control pills to control this abnormal bleeding until May 1, 1978. This should have put the physicians on alert for potential cervical cancer. On June 28, 1978, at the OB/GYN clinic, Shilla Wheat had an endometrial biopsy of the upper part of the uterus. This test proved negative. No fractional dilation and curretage (D & C) or laproscopy was performed, even though they were ordered, and even though the standard of medical care required that they be performed. No tests were ordered to be done in the future. Had a fractional D & C been performed, there is a high probability the cancer would have been detected. On July 17, 1978, she returned to the clinic for an examination. She returned on July 20, 1978 suffering from abnormal uterine bleeding; abdominal pain; and a white, jelly-like vaginal discharge. Shilla Wheat was referred to the OB/GYN Clinic. A fractional D & C was ordered, as well as a laproscopy scheduled for August 9, 1978. The Court believes that the proper standard of medical care required the doctors to perform a pap smear, a fractional D & C and even a biopsy of the cervix. This was not done. The failure to do these tests, however, was at least in part due to the military orders for a transfer for Mr. Bill Wheat. Shilla Wheat did not return for these tests. It is difficult from the record to determine whether the Government was negligent in not stressing to Shilla Wheat the importance of these tests. The Court could find

no evidence on this specific point. The importance of these missed tests is evident later when the Army physicians fail to reschedule the examinations when Shilla Wheat returned to their care later the same year.

On October 23, 1978, Shilla Wheat returned to the medical facilities at the Darnall Hospital OB/GYN Clinic. The physicians followed the proper standard of care to the degree that they took another pap smear. Unfortunately, the cytology examination was recorded as negative. This was in error. A medical technician or physician should have detected that the pap smear had an abnormal finding of trichomonas. The physicians should have then treated the trichomonas with antibiotics: The trichomonas was untreated. No repeat pap smear was ordered, even though the proper standard of medical care required a repeat pap smear because trichomonas can interfere with the proper analysis. The Court believes that a subsequent pap smear would have detected Shilla Wheat's cervical cancer. Had the cancer been diagnosed at this early stage, it could have been treated and Shilla Wheat would have lived a normal life expectancy. What is amazing here, and it is a thread of negligence that weaves its way through the entire fabric of the government medical care, is that Shilla Wheat's medical records were never reviewed. The medical records plainly reveal that the laproscopy and D & C procedure that had been ordered back on July 20, 1978 had not been performed. Standard medical care would have required the physicians who were examining her on October 23, 1978, to now order these procedures be taken. Certainly, the cancer would then have been discovered. The importance of the detection of the cancer at this time cannot be overstated. Early diagnosis is the most important element in cancer treatment. Determination of what stage the cancer is in is crucial to proper treatment. Once diagnosed, the cancer would have been treated and cured in this case. Left undiagnosed, the cancer would continue to spread and eventually cause the wrongful death of Shilla Wheat. The Court finds that the failure of military physicians to comply with the proper standard of medical care on October 23, 1978, was a proximate cause of Shilla Wheat's intense and long-lasting pain and suffering. In any event, given the information of Shilla Wheat's symptoms, a pap smear should have been ordered to be performed, at the very latest, within six months after October, 1978. This was not done. A simple pap smear performed in April of 1979 might have detected the cervical cancer. Proper treatment could have cured the cancer and she could have lived out a normal life expectancy. Thus, the United States Army physicians exhibited little, if any, attention to the requirements of even a minimum standard of medical care. Although there are acts of negligence that occurred after this first period of military medical care, it is clear to this Court that had the United States provided the proper level of medical care during this time period, Shilla Wheat's cancer would have been diagnosed, and would have been treatable. The Court finds that this breach of the proper standard of medical care was a proximate cause of Shilla Wheat's prolonged suffering and wrongful death.

*Medical Treatment By Dr. Wood (1979–1981)*

Despite witnessing Dr. Wood in the Courtroom during his testimony and throughout the course of the trial, the Court is unable to understand his intentional acts of medical malpractice on Shilla Wheat. Dr. Harold Wood is a civilian medical doctor. His office is in Killeen, Texas. His area of expertise is in the field of obstetrics and gynecology. Dissatisfied with the care she was receiving from the army medical services, Shilla and her husband visited the offices of Dr. Wood. When she first saw Dr. Wood, she told him of symptoms of pelvic soreness, menstrual irregularity, and vaginal pain during intercourse. The medical examination he gave Shilla Wheat revealed a fullness in her lower abdomen, with tenderness on deep pressure. It also revealed a uterus irregu-

lar in outline, and adnexa areas with slight irregularity and fixation. Dr. Wood performed none of the basic tests that would have revealed the carcinoma. He did not do a repeat pap smear; he did not do a fractional D & C. He did not obtain her medical records from Darnall Army Hospital. He did not perform a cervical biopsy. He did not perform a culdoscopic examination. All of these would have conformed with the proper standard of medical care. Instead he performed a hysterectomy on September 18, 1979. Dr. Wood did not perform any appropriate examination or follow the proper and standard medical procedures. The hysterectomy was actually one of the worst procedures that Dr. Wood could have done, as it caused the malignancy to accelerate. The hysterectomy removed the uterus and the left utero-sacral ligament.

Through the operation, Dr. Wood's actions were simply negligent, in fact grossly negligent. He admitted as much from the witness stand. After this date, his actions were intentional, and were based on reasons the Court is unable to fathom. Cancer can be staged both clinically and pathologically. Here the failure to clinically determine the stage of cancer was negligence on Dr. Wood's part. This would have been done by a reasonably competent and prudent gynecologist. A pathological study was done on the tissue taken from Shilla Wheat during her hysterectomy on September 18, 1979. The study revealed a Stage II–B cancer of the cervix. Dr. Wood knew this within a few days of the operation. Despite the pathology report prepared by Dr. Wilma Shields, Dr. Wood never told Shilla Wheat, or her husband William Wheat, about her cancer, despite her many visits to him for medical care. He would examine and treat her on October 2, 1979, October 9, 1979, October 23, 1979, November 23, 1979, January 29, 1980, and February 15, 1980. Shilla Wheat was never treated by Dr. Wood for her cancer, nor informed by him of her cancer. Although she would return to Army physicians for medical care, she returned to Dr. Wood for treatment on January 28, 1981, February

10, 1981, and February 17, 1981. During these latter visits, her health had deteriorated to the point that the cancer was irreversible. Still, Dr. Wood admitted from the witness stand that he never informed Shilla Wheat or anyone in her family that she had cancer of the cervix even though he noted it in his own medical records. He also admitted that he never treated her for the cancer and never referred her to anyone for treatment.

■ Under Texas law, "[a] cause of action for medical malpractice is essentially a negligence action." *James v. Brown*, 637 S.W.2d 914, 918 (Tex.1982). Plaintiff must establish four elements to prevail: a legally cognizable duty, a failure to conform to the required standard of care, resulting actual injury, and proximate causation. *Lanier v. Sallas*, 777 F.2d 321, 323 (5th Cir.1985), *citing Cloys v. Turbin*, 608 S.W.2d 697, 700 (Tex.Civ.App.1980). This merely expands the law of *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779 (1949), in which the Texas Supreme Court wrote that

[A] patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the Defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries. 219 S.W.2d at 782.

*Id.* 219 S.W.2d at 779. The Court finds that as a matter of law, Plaintiffs have established that Dr. Wood, as Shilla Wheat's treating physician, owed her a duty to exercise the degree of skill ordinarily employed under similar circumstances by a similar specialist in the field. *Lanier v. Sallas*, 777 F.2d 321, 323 (5th Cir. 1985). That standard of care or degree of skill in this case required Dr. Wood to inform Shilla Wheat (or her family) of her cancer of the cervix, or to refer her to another physician for treatment of that cancer, or to properly treat the cancer himself if he was able. The Court finds that Shilla Wheat's cancer was treatable during the first period of time that she was Dr.

Wood's patient from September, 1978, to February, 1980. The Court finds that Dr. Wood's actions were a gross failure to conform to even the most minimum standard of care. *See Hood v. Phillips,* 554 S.W.2d 160, 166 (Tex.1977). Had the cancer been treated, had she been cared for properly, Shilla Wheat would be alive today, living a normal life. Instead, due to Dr. Wood's inexcusable negligent and intentional actions, Shilla Wheat suffered gruesome symptoms and extraordinary pain for years, and finally died much earlier than she would have had the cancer been treated. The Court listened to the testimony of all the expert witnesses, and is convinced that Dr. Wood's actions were a proximate cause of Shilla Wheat's pain, suffering, and death.

Under Texas law, which governs this case, proximate cause consists of two elements, causation in fact and foreseeability. *Missouri Pacific Railroad Co. v. American Statesman,* 552 S.W.2d 99, 103 (Tex. 1977). Both of these must be present to establish liability. *Clark v. Waggoner,* 452 S.W.2d 437 (Tex.1970). Foreseeability is established by proof that the actor as a physician of ordinary intelligence and prudence should have anticipated the damage to his patient created by his act. *Id.* at 439–40. Foreseeability does not require anticipation of the precise circumstances that produced the injuries, only that the physician ought to have forseen generally that consequences of a certain kind could result from his actions. *Lanier v. Sallas,* 777 F.2d at 324. Dr. Wood's negligence, and his intentional acts were admitted by him while he was on the stand. The Defendant doctor's own testimony can comprise the necessary medical proof of malpractice. *Ayers v. United States,* 750 F.2d 449, 455 (5th Cir.1985). In addition, in this case, the Court heard the testimony of Dr. Hadju and Dr. Davis. Both of them testified that in their opinion, Dr. Wood's care in treatment and diagnosis of Shilla Wheat was far below the proper standard of care; and that her pain and ultimately her death were foreseeable to Dr. Wood. This Court has no reservation in finding that Shilla Wheat's pain and suffering, her mental anguish, her depression, and her wrongful death were caused by Dr. Wood's intentional failure to treat her carcinoma, or to even tell her of her illness. He is no less responsible for the pain and suffering and mental anguish of the Plaintiffs, Shilla Wheat's family. Therefore, the Court finds that Dr. Wood is liable, severally and jointly, for the damages sustained by Shilla Wheat and her family.

*Return to Army Medical Care*

The Court must perform the same analysis of the medical care provided by the United States physicians and hospitals to Shilla Wheat. Shilla Wheat was to leave the care of a physician who was intentionally withholding the medical care that she needed to survive and find in his place physicians unable to detect cancer that would grow under their treatment into its critical stages. The Government's theory is that the Army physicians were not negligent. Alternatively, the Government contends that even if the Army physicians were negligent, this negligence was not the proximate cause of Shilla Wheat's death because she was terminally ill when she first came to them for care. Thus, the Government has raised two distinct questions: first, was there malpractice or negligence in the medical care of Shilla Wheat by the Government; and even if there was malpractice, was it the proximate cause of Shilla Wheat's wrongful death and pain and suffering.

Texas law governs the claims in this suit. Under the Federal Torts Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, [FTCA], liability for medical malpractice is controlled by state law. *See Ayers v. United States,* 750 F.2d 449, at 452 n. 1 (5th Cir.1985) *citing United States v. Muniz,* 374 U.S. 150, 152–53, 83 S.Ct. 1850, 1852, 10 L.Ed.2d 805 (1963). Under the FTCA, the United States has waived its sovereign immunity for tortious conduct committed by its employees acting within the scope of their employment and makes it liable as a private individual would be. *See Speer v. United States,* 512 F.Supp. 670, 674 (N.D.

Tex.1981), *aff'd*, 675 F.2d 100 (5th Cir. 1982).

On March 31, 1980, Shilla Wheat returned for treatment to the medical services of Darnall Army Hospital. Her symptoms had now shifted to her rectal area. She had hemorroids and bleeding from the rectum. She was treated in the Darnall Family Practice Clinic where the physician noted in his records that tests should be performed to eliminate cancer as the cause. Shilla Wheat was referred to the General Surgery Clinic at Darnall Army Hospital for further medical attention. It is on this first visit that the negligence of the Army began again. Although the physicians and medical staff for the United States often failed to meet the minimum reasonable standard of medical care in their treatment of Shilla Wheat, the Court is most appalled by the failure of these persons trained in medicine to ever request her previous medical records from Dr. Wood. The military physicians should have obtained the medical records from her previous physician who performed the hysterectomy. Both the pathology report from the hysterectomy and Dr. Wood's medical records revealed that Shilla Wheat had cancer of the cervix. The medical records from March 31, 1980 do not state that any tests were ordered. It offers no explanation of the causes of these symptoms. It is void of medical analysis.

On April 4, 1980, April 7, 1980, and May 2, 1980, Shilla Wheat continued to visit the Army physicians with complaints of rectal pain and bleeding. No medical tests were performed to rule out cervical cancer. A proctoscopy was performed to determine if there were any lesions in her bowels. This is one of the few proper diagnostic tests that was performed on Shilla Wheat. For example, on May 5, 1980, her medical report shows that the doctors performed no diagnostic tests; Shilla Wheat's only treatment was a prescription for pain medication.

On May 16, 1980, Shilla Wheat was treated at the Darnall Surgical Clinic. Her symptoms were colon problems, changes in bowel habits, constipation, diarrhea, and hemorroids. Despite continuing problems in the pelvic and rectal areas; despite her recent hysterectomy, no physician had yet eliminated cancer as a potential cause, nor had she been seen by a gynecologist. None of the limited diagnostic tests that the physicians had conducted determined the cause of her symptoms. Nor had anyone yet requested that Shilla Wheat obtain her medical records from Dr. Wood. On June 6, 1980, Shilla Wheat returned to the clinic. She was given more pain killers, Valium and Tylenol # 3, containing codeine. The medical records from that date reflect that Shilla Wheat reported a total abdominal hysterectomy and an anterior repair. This was incorrect. Shilla Wheat did not have an anterior repair. This is yet another mistake caused by the failure to obtain the medical records. The Court can find no explanation why any reasonable physician in this type of case would rely on a patient's recollection of her medical history instead of obtaining the actual medical records and reviewing them.

On June 11, 1980, Shilla experienced abdominal pain. The proctoscopic examination had revealed some inflammation. The doctors had now eliminated cancer of the colon as the source of her pain. They had done none of the tests necessary to determine if Shilla Wheat had cancer of the cervix. On June 16, 1980, there was a prescription for Valium given, along with a different pain medication, Phenathen # 3 which contains codeine. This is evidence that the constant pain Shilla Wheat was suffering was severe enough for a trained physician to prescribe medicine strictly for the pain. Thus, the Court finds that the pain Shilla Wheat suffered was substantial and continuous.

On June 18, 1980, Shilla Wheat went to the Darnall Gynecological Clinic for the first time. She was treated by Army medical personnel. She told the physician that she had had a hysterectomy. She complained of lower back pain, pain on intercourse, and pressure in her bowels since January, 1980. She compared the sensa-

tion to having a constant bowel movement. The medical records reveal that her abdominal area was tender to deep pressure by the fingers and the vaginal cuff was indurated and swollen producing pain in her legs and back pain. Shilla Wheat was examined by Dr. Ron Wilson. She had experienced continuous pain from March 1980 until June 1980. No doctor had yet diagnosed the cancer of the cervix.

The June 18, 1980 examination revealed an abnormal mass at the top of the vagina, with the cuff portion extending out to the left side. The left ovary was firm, and fixed slightly more than usual. This should have been interpreted as a potential sign of cancer of the cervix, and potentially an extension of that cancer. The medical standard of care required that the tumor be biopsied. Instead, Dr. Wilson decided without further examination that her problem was either cellulitis or a tumor. The Court believes that any medical standard of care, no matter how minimal, required that the physicians take the appropriate tests to eliminate cancer as the cause of these symptoms. This would have revealed the invasive carcinoma of the cervix. Had it been biopsied, there is a reasonable probability that the cancer would have been detected. If the cancer had been detected and treated in June 1980, Shilla Wheat would have lived a normal life expectancy. The failure to biopsy that mass was negligent. A foreseeable result of the failure to biopsy a mass that appeared irregular and possibly cancerous is that the mass would continue to grow and spread and eventually cause death. It would cause pain and suffering until death occurred. The failure to biopsy this tumor was the cause in fact of the failure to diagnose or treat the cancer that eventually killed Shilla Wheat. This failure was negligent and was a proximate cause of pain and suffering both to Shilla Wheat and to her family. It resulted in the death of Shilla Wheat. While a biopsy would have been a very effective diagnostic tool, the Court notes that the physicians failed to perform even the minimal medical procedure of a simple pap smear, despite the discovery of a firm left

ovary with a possible mass that was not mobile. The Court notes that the doctors still had not requested her medical records from Dr. Wood. This negligence shocks the conscience. The Court strongly believes that any minimum standard of care for the treatment of a woman with a history of symptoms like Plaintiff's requires that the physicians obtain her medical records. This was her initial visit to the military gynecologist. The doctor had before him no record of her hysterectomy, or why it was performed, or what the physician who performed it found nor did he display the slightest professional curiosity about these matters. The gynecologist worked with blinders by failing to obtain some record as to what medical treatment and diagnosis had occurred before. Shilla Wheat was not a patient exhibiting normal symptoms in for a routine checkup. She was a patient already taking prescription narcotics for her pain who had been seeking medical treatment continuously for essentially the same symptoms for years. Shilla Wheat was examined at the Darnall Surgical Clinic by Army medical personnel on July 3, 1980. The physicians prescribed a refill of her pain medication, Phenathen # 3 and Valium and told to use her metamucil.

On July 22, 1980, Shilla Wheat went to the gastroenterology clinic at Brooke Army Hospital in San Antonio, Texas. The doctor wrote in her medical records that she had cryptitis (a rectal ailment). Her rectal pain was continuing to increase. The physician made no diagnosis beyond that of cryptitis. The only treatment ordered for her was to sit in hot water two to three times a day. The Army physicians had still not diagnosed, or eliminated as a potential cause of her pain, cancer of the cervix. Nor had the Army taken any of the proper diagnostic procedures to determine the medical cause of her symptoms. On July 30, 1980, Shilla Wheat was showing signs of extreme emotional stress and mental anguish. She was seen at the Darnall Surgical Clinic. The treatment they prescribed was Valium and suppositories. This emo-

tional stress would increase until her death. The mental anguish was a direct result of the collective negligence of the Army physicians and the intentional actions of Dr. Wood. The mental anguish was directly and proximately caused entirely by the failure of any physician to properly diagnose her disease, a disease that manifested itself in the form of severe and obvious symptoms. Instead, Shilla Wheat, from all the testimony, a strong and independent woman, was now suffering daily from constant pain—pain that was never explained to her until after she suffered renal failure. This Court believes that the emotional stress was a result of the failure of the physicians to diagnose the cancer as the *cause* of her pain. Instead, she was left to doubt her own sanity as the physicians continued to tell her that they could find nothing wrong with her physically.

On August 12, 1980, Shilla Wheat went to the Emergency Room with severe back, rectal, and leg pain. Dr. Wilson again took her history of previous problems. The Army medical personnel made no diagnosis. On August 15, 1980, she was referred to the Darnall OB/GYN clinic. Her sedimentation rate was elevated. A sedimentation test examines the blood cells. An abnormal or elevated rate indicates a medical problem. The Court finds that this is particularly important in the case of Shilla Wheat. Had her problems been only psychological, as she was being advised, her sedimentation rate would not have been elevated. The elevation of that rate indicated a physiological, and not a psychological problem. Dr. Wilson examined her, and again noted that a layer of inflamed or indurated tissue remained at the vaginal cuff (the area that was sewn together after the hysterectomy). He again diagnosed possible ligeonous cellulitis. This is usually associated with an inflammatory process or with cancer and should have been of special concern to Dr. Wilson since the course of antibiotic therapy prescribed by him on June 18, 1980 had not remedied the cellulitis. The standard of medical care required the physicians to conduct a biopsy, but one was not done. In fact, none of the basic tests to diagnose cancer of the cervix or pelvic area had been performed. No fractional D & C was performed. No laproscopy was performed. No pap smear had been taken since October, 1978. No biopsy was taken. Shilla Wheat's medical records had never been ordered or reviewed. Any of these basic tests could have diagnosed the cancer. Properly diagnosed and treated in August, 1980, Shilla Wheat would have lived a normal life expectancy, free of the pain and suffering she was not living with daily. The failure to perform these tests is unacceptable. In 1980, in Central Texas, the basic standard of medical gynecological care was violated by the failure to utilize any of these medical procedures. The mere refilling of a prescription for pain killers was grossly insufficient. Still on August 21, 1980, the Darnall Surgical Clinic did nothing more.

On August 22, 1980, Shilla Wheat was seen by the physical therapy department for her back pain. On August 27, 1980, she was referred to orthopedics for physical therapy. She now had pain radiating to the right hip. She reported that she had the pain for six months. Her physical examination was normal. Her level of pain was not increasing rapidly. She complained of lower back pain. The medical staff performed no tests to reveal the source. Two days later, on August 29, 1980, she saw Dr. Marquez. Nerve conduction studies were performed that were determined to be negative. She reported that her pain continued to increase. The physicians were not able to identify the source of her pain but on September 4, 1980, they refilled her narcotic pain prescriptions. They had decided that her problems were psychological and not physiological. This assumption wrongfully coloured their treatment of Shilla Wheat.

On September 10, 1980, she returned to the gynecological clinic and again saw Dr. Wilson. Her medical history was written incorrectly. Ligenous cellulitis was again noted in her medical records. The continuation of her problems with the indurated tissue and the vaginal cuff was also noted.

The pelvis was becoming hard and indurated, a condition associated with inflammatory changes or tumor. The medical records noted a reduction in the size of the indurated, tender area. Still, the physicians had not conducted any test to rule out a cancerous tumor. They were aware of the indurated area but they did not biopsy the area. The physicians failed to employ the proper, standard medical examination to rule out cancer of the cervix. Despite the unsuccessful antibiotic therapy prescribed on June 18, 1980, and again on August 15, 1980, Dr. Wilson continued to treat her medical problem as ligenous cellulitis. He ordered another course of antibiotic therapy. The Court finds that had she been properly examined, her cancer would have been discovered. Had the physicians discovered the cancer in September of 1980, Shilla Wheat would have lived a normal life expectancy. The failure by Dr. Wilson and the other Army physicians to comply with the proper standard of medical care throughout their treatment of Shilla Wheat was a proximate cause of her pain, suffering, mental anguish and eventual death.

On October 9, 1980, Shilla Wheat visited the Darnall Surgery Clinic where she was given additional refills on her pain medications. On October 20, Shilla Wheat visited Darnall Surgery Clinic again. Shilla Wheat returned to the OB/GYN Clinic. Her symptoms included burning on urination, or dysuria. The Army medical personnel again noted the mass in the pelvis. She was suffering pain on intercourse and vaginal discharge. The bimanual examination revealed firm tissue, tender and large, with no change from the last examination. The medical opinion noted in the records is that the mass is scar tissue. This was careless and incorrect. No proper diagnostic tests were conducted to determine the nature of the mass in her pelvis. The Army physicians did not perform a biopsy. They did not even perform a simple pap smear. Either of these examinations, especially the biopsy, would have revealed the cancer of the cervix. The failure to perform these examinations was negligent and

was a proximate cause of Shilla Wheat's pain and eventual death.

On November 6, Shilla Wheat reported increased pain that was unrelieved by three codeine tablets. The medical record reflects that this pain had existed since January, 1980. The record also states that Shilla Wheat had her hysterectomy in September, 1980. This was incorrect, the hysterectomy occurred in 1979. Shilla Wheat again complained of increased pain and of depression. These were not statements prepared for a lawsuit to garner jury sympathy. *Cf. See Austin Rd. Co. v. Thompson*, 275 S.W.2d 521 (Tex.Civ.App.—Fort Worth 1955, writ ref'd n.r.e.). These were the symptoms of a woman frightened by her illness, and the failure by the physicians to diagnose her illness. She told her physician that she had been crying and was now sometimes hostile with her family. The assessment at the Darnall Family Practice Center was that Shilla Wheat was suffering depression with rectal pain. Again, this was not a diagnosis. It was a conclusion. A diagnosis is rendered after a diagnostic examination is ordered and given. Had cancer been diagnosed at this time, it is possible that she might have been saved. Certainly, it would have allowed the physicians to properly treat the pain and symptoms she was experiencing more precisely and efficiently. It would have been beneficial to Shilla Wheat psychologically to know the source of her symptoms. Instead, the physicians could not treat her illness, they could only give her narcotics to treat her pain.

On November 13, 1980, physicians at the Darnall Family Practice Clinic prescribed Phenathen #3. The records indicate she was seen by Dr. Sullivan. He decided to increase the strength of her medicine. The medical records noted that her pain was not being alleviated and was still the same despite the narcotic drugs being prescribed for her.

On November 20, 1980, Shilla Wheat was referred to Brooke Army Hospital General Surgery Clinic. She was seen by Dr. Rosenthal. They discussed her emotional

stress at length. The doctor had reviewed her chart beginning with the pap smear of May, 1978. He concluded that she had irritable bowel syndrome, as the result of emotional stress and he reassured her that she had no ("no" was underlined) neoplasm, or cancer. He assured her that she had no condition requiring surgery. The physician performed an anal examination, an abdominal examination, and a pelvic examination. It is an understatement that this analysis was incorrect. Had the physician only had her medical records or performed the proper medical diagnostic tests, he would have known that Shilla Wheat was suffering from cancer. Of great concern to this Court is the mental anguish that he caused Shilla Wheat by informing her that her problems were "all in her head" and had no physical basis.

On November 21, 1980, Shilla Wheat is complaining of sudden vaginal bleeding at the Darnall Family Practice Clinic. No diagnostic tests were conducted. On November 25, 1980; December 2, 1980; and December 11, 1980, Shilla Wheat was counseled for depression and treated with antidepressant medications. Her physicians were convinced that her symptoms were entirely emotionally based. No diagnostic tests were taken. Her worry, fear, concern and despondence were causing her and her family substantial mental anguish.

On December 22, 1980, Shilla Wheat was suffering from severe rectal pain extending to her hips. She returned again to the Darnall Family Practice Clinic. The diagnosis was pain secondary to spastic colon. On December 23, 1980, she returned to the clinic with symptoms of bilateral leg pain and increasing back pain.

On December 30, 1980, Shilla Wheat was hospitalized at Darnall Army Hospital. She fainted at work. She was suffering from upper quadrant pain, nausea, and constipation. She sought the care of Dr. Sullivan of the Darnall Family Practice Clinic. His assessment was that her problems were psychological. She was treated with placebos for her pain and a psychiatric consultation was ordered. It was never performed. She had continuing abdominal pain but was released on January 1, 1981. Her renal failure was but two months away. The medical record is brief but chilling: [diagnosis] 1. Depression; 2. Hypertension is controlled; and 3. Abdominal pain, etiology undetermined, resolved.

This litany of pain and anguish is replete with a complete lack of medical care. Had the Army medical personnel given her the proper diagnostic tests they would have discovered her cancer. Had they ordered and obtained her medical records from Dr. Wood, they could have learned of his earlier diagnosis of cancer. These failures were negligent. Had they treated it, she would have lived a normal life expectancy. If cancer is malignant, each passing day without treatment reduces the ability to treat it successfully. Cancer cells are competing with healthy cells. Untreated, the cancer cells prevail. By the time Shilla Wheat left the Government's care, she had lost her opportunity to be treated successfully in terms of living a normal life expectancy. The Government owed Shilla Wheat the duty of reasonable care and treatment of her illness. Texas law imposes on the treating physicians a duty to exercise the degree of care that a physician of that specialization, of ordinary prudence and skill, practicing in the community or a similar community would have exercised the same or similar circumstances at that time. The physicians had a duty to perform proper diagnostic examinations. They had a duty to request her medical records. The failure to perform the proper diagnostic tests or to request those records was a breach of the proper standard of medical care required in Central Texas in 1980. The failure to perform these tests would result in the delay in treatment that would cost Shilla Wheat her life.

Two months later, on March 1, 1981, Shilla Wheat suffered renal failure and was admitted comatose to Metroplex Hospital in Killeen, Texas. She was transferred to Darnall Army Hospital for emergency surgery on March 7, 1981 where a nephrostomy tube was inserted. She was transfer-

red to Scott & White Hospital on March 8, 1981. It was at Scott & White Hospital that she learned that she had cervical cancer. The renal failure was caused by the spread of the cancer throughout the pelvis resulting in a bilateral urethral obstruction. The cancer was now terminal. Her life would end, after a long period of pain and suffering, on March 10, 1982; the result of untimely diagnosed and untimely treated cancer of the cervix with metastasis.

Under Texas law, a "proximate cause is a cause that in a natural and continuous sequence, produces the event, it should have been foreseen by a person exercising ordinary care. *Speer v. United States*, 512 F.Supp. 670, 678 (N.D.Tex.1981), *aff'd* 675 F.2d 100 (5th Cir.1982). Proximate cause has two components (1) cause in fact, and (2) foreseeability. *Missouri Pacific Railroad Co. v. American Statesman*, 552 S.W.2d 99, 103 (Tex.1977). Both elements must be present. *Clark v. Waggoner*, 452 S.W.2d 437 (Tex.1970). Cause-in-fact in this context means that the negligent act or omission was a substantial factor in causing the injury and without which no harm would have been incurred. *Texas and Pacific Railway Company v. McCleery*, 418 S.W.2d 494 (Tex.1967). The element of foreseeability is satisfied by a preponderance of evidence that the physician, as a physician of ordinary skill, should have anticipated the danger to others by his negligent act. A physician is liable only for those harmful consequences that he could reasonably foresee. *Nicodeme v. Bailey*, 243 S.W.2d 397, 401 (Tex.Civ.App.—El Paso 1951, writ ref'd n.r.e.). The Court is convinced that throughout the course of her medical treatment by the military physicians and the Army hospitals, the Army's negligence was a cause in fact of Shilla Wheat's pain and suffering, and eventually her wrongful death. What is shocking is the number of physicians and medical personnel who failed to utilize proper medical procedures. Had any of them requested the medical history from the recent hysterectomy operation for a patient who had severe problems in the cervical area, that physician would not

have needed to diagnose the cancer; it was in the pathology report and in Dr. Wood's reports. Had any of the physicians conducted the proper diagnostic examinations, it is certain that they would have discovered the cancer.

The physicians for the United States were incorrect in their diagnosis and failed to conduct proper diagnostic examinations. Thus, they breached the reasonable standard of medical care both by the failure to conduct the appropriate diagnostic examinations and in their failure to recognize Shilla Wheat's symptoms as indicative of a particular disease. Reasonable medical care is determined by a professional standard. *Williams v. Bennett*, 610 S.W.2d 144, 146 (Tex.1980). *Speer v. United States*, 512 F.Supp. 670, 675, *aff'd*, 675 F.2d 100 (5th Cir.1982). This failure caused a delay in the administration of proper chemotherapy or other appropriate cancer treatment. The burden on Plaintiff in this case is to establish that the Defendant's diagnostic procedure failed to meet the required standard of medical care, that the Plaintiff refrained from seeking proper medical treatment because of the improper diagnosis, and that the Plaintiff was injured as a result of the delay and that the delay was the proximate cause of the Plaintiff's injuries. The Court is well aware that negligence may not be imputed merely from the poor results of treatment. *Shinnett v. Price*, 446 S.W.2d 893, 396 (Tex.Civ. App.—Amarillo 1969, writ ref'd n.r.e.).

■ The first decision this Court must reach is whether Defendants negligently failed to perform the appropriate diagnostic tests. *See Garza v. Keillor*, 623 S.W.2d 669, 672 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). The record in this case is replete with evidence of the failure by the Army physicians to perform the appropriate diagnostic tests. The Court has, in its factual summary, listed a number of occasions in which the physicians failed to perform a pap smear or a biopsy, or any of the other appropriate tests such as a laproscopy. The Court believes that the reasonable standard of care required

that these tests be performed on Shilla Wheat. The Court has specifically found that if these tests had been performed, that the cancer would have been detected, and proper treatment could have been administered. Failure to perform these diagnostic tests was a proximate cause of Shilla Wheat's pain, suffering, and untimely wrongful death.

■ The second area of negligence concerns the claims by Plaintiffs that the Army physicians failed to recognize that the Plaintiff's symptoms indicated a particular disease. *See Prestgord v. Glenn,* 441 S.W.2d 185, 186 (Tex.1969). Plaintiffs established by credible expert testimony of two physicians in the area of expertise of gynecology that Shilla Wheat's symptoms were of the kind to indicate to a reasonably prudent physician that cancer might be indicated. Shilla Wheat was suffering from unusual vaginal discharge. She was suffering heavy menstrual cramps and irregular periods and vaginal bleeding. Perhaps most shocking was the fact that the pelvis was becoming inflexible, and a bimanual examination revealed a tumor. Dr. Tad Davis testified that any of these could be an indication of cancer of the cervix. As the Court has made clear, the Army physicians neither conducted diagnostic examinations to determine cancer, nor did they conduct diagnostic examinations, despite her symptoms, to determine that it was not cancer of the cervix. The Court believes that this failure breached the reasonable standard of medical care by the Army physicians, and that this failure to recognize these symptoms as potentially being cancer was negligent and was the proximate cause of Shilla Wheat's pain and suffering and wrongful death. The Court specifically finds from the expert testimony adduced at trial that the delay in providing appropriate chemotherapy or other cancer treatment caused the injuries sustained by Shilla Wheat. *See Arrendale v. United States,* 469 F.Supp. 883 (N.D.Tex.1979). Plaintiff also established that treatment would have been available had the condition been properly diagnosed. *Id.* at 892. If the correct diagnosis would have been made before the renal failure, appropriate treatment would have saved Shilla Wheat's life. By the time Shilla Wheat had the renal failure she was terminally ill. It is not medically possible to state at exactly what moment during the long period of Army medical care Shilla Wheat could no longer be saved by cancer treatment or chemotherapy. Shilla Wheat was not terminally ill when she left the care of Dr. Wood. The Court, as a finder of fact, is certain that Shilla Wheat's life could have been saved had the Army conducted the proper diagnostic tests and provided the appropriate medical treatment either before or after Shilla Wheat's treatment by Dr. Wood. Therefore, the Court finds that the care given by the Defendant United States to Shilla Wheat was substandard, and was the proximate cause of pain and suffering to Shilla Wheat and her family and the wrongful death of Shilla Wheat.

*The Harpers*

Mary Catherine Harper, age sixty-seven, is Shilla Wheat's mother. Albert Harper is Shilla Wheat's father. The Harpers were and are simple, good, "Salt of the Earth" people from a small town in Arkansas. They had three children; Shilla was the oldest, born on September 18, 1940, in Pine Bluff, Arkansas, where her father Albert had been born. Shilla was, from the youngest of years, responsible for many of the family duties and chores. She took care of her younger brothers. She made all of the clothes for her family. The picture this couple sketched of their daughter Shilla was of a person who was a strong, hard-working, Christian woman. There were periods of time when Mrs. Harper would be ill and in the hospital and the burden of serving an extended family fell on Shilla Wheat's young shoulders. At trial, Mr. Harper described his relationship with Shilla Wheat as strong and intimate. The Harpers frequently made the trip from Pine Bluff, Arkansas, to Killeen, Texas, to be with their daughter during her illness. They stayed in Killeen for five to six days at a time caring for her. Shortly after

Shilla's death, the Harpers had to suffer the loss of one of their sons without her emotional support. Mrs. Harper has suffered serious illnesses since Shilla Wheat's death, and again, Shilla has not been able to assist her. The parents, throughout Shilla's ordeal, suffered with her; initially, through her correspondence. During the renal failure incident and the subsequent cardiac arrest, they were at her bedside. They stayed at Darnall and Scott & White hospitals with her, giving her comfort and sharing her sorrow and a measure of her pain. It was at Scott & White Hospital that the Harpers learned their daughter had terminal cancer. Throughout the spring and summer of 1981, Shilla would call her mother and the Harpers would come and visit and take care of her. Soon, it would become necessary to move to California for the emotional support of the husband's family. Until then, the Harpers witnessed her deterioration and helped her try to keep a normal schedule. They remember watching Shilla Wheat lie in bed with the bags attached to her sides. They discussed her imminent death with her. They had to experience Shilla's frustration and mental anguish. Even while Shilla was in California, she communicated with her family regularly. They suffered with Shilla when medication caused Shilla to lose her sight. Finally, they were awakened to learn, by telephone, that Shilla had died. The Harpers flew to California for her funeral. The family had lost her advice and counsel, her love and affection. It is clear to the Court from the testimony that Shilla was the centerpiece of the extended Harper/Wheat family. She carried the burden of being the one to whom everyone turned for advice. That advice is no longer available. Her companionship is but a bittersweet memory. Shilla's mother said it most eloquently, "Christmas is not like it used to be." The Harpers testified that they have not lost financial support by Shilla's death. The Court has not taken any financial loss into consideration.

*Freda Joyce Watson*

Freda Joyce Watson is the older daughter of Shilla Wheat. At twenty-five, she is eight years older than Mallette. She, like Shilla, was born in Pine Bluff, Arkansas. During Joyce's childhood years, Shilla was always at home with her daughter. After her divorce, Shilla had to go to work but she remained active in Joyce's school activities. Shilla maintained an active role in her daughter's life. Joyce stayed in Arkansas when Shilla moved to Texas with her new husband. Shilla continued to take an active role in Joyce's life, including Joyce's new role as a nurse and as a mother, even though geographically separated. The Court saw the dresses that Shilla had made for Joyce's daughter, including a dress that had to be hand sewn because Shilla was too ill to use a machine. Joyce's daughter visited Shilla on a regular basis. Shilla's homemade dresses helped Joyce's family financially. Joyce and her daughter, Michelle, could always expect a new dress on their birthdays and other holidays. Shilla first met her grandchild Michelle in July of 1978, the year Michelle was born. They saw Shilla again in 1979, in Texas. Letters and phone calls would continue. Although she was not living in Texas with the Wheats, she came to Killeen, Texas, when Shilla had renal failure, and visited her at Scott & White Hospital before Shilla Wheat left for California. Joyce shared Shilla's embarrassment over the colostomy bags. Shilla had provided emotional support during Joyce's divorce in 1979. Shilla was "always there" with financial assistance. If Joyce or Michelle were ill, Shilla would provide financial support. Joyce attended her mother's funeral. Joyce testified that she had to take tranquilizers and received professional counseling for the trauma of her mother's death.

Joyce had required medical treatment herself after an irregular pap smear was made. Therefore, Joyce has a vicarious relationship to her mother's experience. Fortunately, Joyce was properly treated, and she has recently given birth. Shilla Wheat will never know that grandchild. The child will not have or know Shilla Wheat as a grandmother. Joyce remarried

in 1983, but her mother died before she could see this occur.

*Shilla Malette Aaron*

Shilla Malette was born in 1968. She is a senior in high school, and aspires to be a nurse. She was three years old when her parents separated. Until Shilla remarried, she was Malette's single parent. Malette lived with her mother until she was thirteen. At thirteen, Shilla's illness forced Malette to return to Pine Bluff, Arkansas. Shilla made all of Malette's clothes and instilled in her a strong Christian faith. Malette met her stepfather William Wheat about eight years ago. She was a witness to a new period of hope in her mother's life, through her remarriage. She would be a witness also to her mother's battle with cancer. Her mother went into the hospital for extended periods of time. Her mother's frustration, pain, disappointment, and fear were etched onto her family's countenance. Malette was a child at the time, and learned the cruel realities of nature— that people can become ill and that they can die. Listening attentively though tearfully to the testimony at trial, Malette became aware of a more harsh reality—her mother's illness could have been properly diagnosed and treated but it was not. Malette was with her mother at the hospital when Shilla was treated for renal failure. She shared the pain that was obvious to every member of the family. She visited the hospital in Texas almost daily while she was living in Texas. She saw the tubes that carried Shilla's excrement from her body. She saw her mother battle the pain of her illness, but continue to do her housework. Eventually, the tasks of the mother fell on the daughter, Malette. She cooked dinner for her stepfather and for herself. She watched her mother's health deteriorate with every passing day. Eventually Shilla's illness so consumed Bill's attention that Malette returned to Arkansas. Still, Shilla would send money for her support, through Mrs. Harper. Communication between mother and daughter remained throughout. Then the phone call came from her grandmother. Shilla Wheat had died. Malette has lost Shilla's assistance with her homework, and the counsel and advice we all seek from our parents. The Court is convinced Shilla Wheat was a woman of extraordinary character, with a strong will to overcome life's adversities. Malette has now lost that most important of the people we will ever know, her mother, as a friend and role model. During the teenage years, the most turbulent period of our lives, Malette has lost a mother who encouraged her to succeed, and demanded no less of herself. Malette has lost her mother's counsel, her love and affection. Her companionship and her emotional assistance have been lost to Malette forever.

*William O. Wheat*

William (Bill) O. Wheat, Shilla Wheat's husband, is now forty-two years old. He served in the U.S. Army 21 years, 9 months. His star would cross with Shilla's when he was stationed in Pine Bluff, Arkansas. When they met she was working at a bag packing company. She was in excellent physical condition, as the rigors of her job demanded. On June 16, 1977, they were married. Shilla Wheat would soon leave Pine Bluff for the first time in her life, to move to the cities of El Paso and Killeen, Texas. The Wheat family eventually moved to Fort Hood, Texas. Shilla started babysitting and sewed for others on the Post. She became a nurse's aid at the Metroplex for $3.65 a hour. Later she went to work as a nurse's aid at a nursing home. The couple enjoyed long walks together and would go to the lake where Shilla would watch Malette and Bill fish. Shilla liked to cook for the family, and she loved to sew. Shilla was the source of advice and counsel for the family. In May of 1978, Shilla began to experience serious bleeding problems. Bill Wheat accompanied her to Dr. Wood's office, who advised both of them that Shilla Wheat needed a hysterectomy. On September 18, 1978, Bill Wheat waited while she had her surgery. After the surgery, Dr. Wood told Bill that Shilla would be fine. Dr. Wood did not inform either of them at any time of Shilla's cancer, despite the fact that Bill attended the office with her on every visit.

Shilla returned to the medical services at Darnall. Her pain was now spreading to her rectum. Bill talked to her treating physicians, Drs. Sullivan and Rosenthal. Dr. Sullivan told Bill Wheat that Shilla's maladies were the psychological result of her hysterectomy. Dr. Rosenthal also told Bill Wheat that there was no physical source for her pain. Bill Wheat received a call that his wife had fainted at work. They returned to Brooke Army Hospital. No Army physician ever told him of his wife's cancer. In January, 1981, the Wheats returned to Dr. Wood. The pain was increasing, despite the narcotic medication various physicians prescribed for her. Bill Wheat watched helplessly as the mysterious illness made Shilla Wheat tire easily, and brought her increasing frustration. He watched her sit and cry alone for long periods of time. On March 1, 1981, he found Shilla unconscious on the hallway floor, and he and Malette took her to the Metroplex Emergency Room, to be treated for what was diagnosed as renal failure. She was placed in intensive care. He watched her lapse into cardiac arrest, and barely escape death at this time. From March 1 to March 7, 1981, she was hospitalized at Metroplex Hospital for kidney failure. She was moved to intensive care. Soon after, Shilla Wheat had cardiac arrest and almost died. William Wheat had the burden of calling the family. He stayed with her from March 1, 1981, to March 7, 1981. No one during this time period told him that his wife had cancer. She went to Darnall Army Hospital on March 7, 1981 where the medical personnel placed a nephrostomy tube in her kidney. She was then sent to Scott & White Hospital. He was with her every minute. At Scott & White Hospital, Dr. May told him that Shilla Wheat had cancer, that it was terminal and that her life expectancy was one to two years. Bill Wheat told his wife that she had cervical cancer. He witnessed Shilla Wheat's frustration and anger from the fact she had never been told.

The Wheat's lives were irreversibly changed from this moment. Every time Shilla Wheat needed to go anywhere, he had to drive her. Suddenly Malette, a teenager, had to face her mother's imminent death. Malette had to cook and clean and take care of the family. Bill and Shilla decided that Malette should return to Pine Bluff, Arkansas. He shared his wife's agony. His job was affected by the strain and by his continuing need to take leave to attend to his wife. He felt the frustration of being unable to explain to his stepdaughter how this could have happened to her mother.

He would visit Shilla at Scott & White Hospital, where she stayed from March 8, 1981 to April 6, 1981. He shared the agony of her chemotherapy and radiation treatment. He would accompany her when she was seen on an out-patient basis. He was with her as much as possible when she was readmitted to Scott & White Hospital on April 19, 1981, where she stayed until May 1, 1981 for displacement of her nephrostomy tubes. He witnessed Shilla's deterioration as she was readmitted to Scott & White Hospital on July 16, 1981 for major surgery. A proximal ileal conduit urinary diversion was accomplished and she was discharged on September 3, 1981. The Court finds that throughout the period of time she was attended by the medical personnel at Scott & White her cancer was malignant and continued to grow within her body. This resulted in constant and increasing pain and mental anguish. Additionally, her pain only served to dramatize to Shilla, Bill, and the entire family the fact that death was increasingly imminent.

In September 1981, he decided to move to California, so he could have the support of his family. Shilla Wheat entered a convalescence hospital for several months. Bill Wheat would go to see his wife immediately after he got home from work. Every moment was filled with the knowledge that death was imminent. Shilla Wheat still believed that she would go home. He was by her side until she died. Shilla Wheat had to take morphine to control her pain, sometimes as much as once every two hours. On March 10, 1982, Shilla Wheat died. Nothing can replace Shilla Wheat's

love and affection and emotional assistance to him. Every human being is irreplaceable. Shilla Wheat seems especially so. Her love, affection, and energy seemed boundless. Shilla Wheat was a strong and loving person. She had the respect and admiration of everyone who knew her. She brought a joy to his life that could not be replaced.

*Damages*

This Court must address what is superficially a difficult philosophical and legal question. Who is more culpable, a physician who is aware of a deadly disease but intentionally fails to treat it, or physicians who through their negligence fail to discover the disease or treat it. The Court notes its belief that had either Dr. Wood or the military physicians properly treated Shilla Wheat, she would have been spared her pain, suffering, and mental anguish and would have lived a normal life expectancy. That belief resolves the legal questions. All of the physicians involved in this tragedy must share joint and several liability. All of their acts contributed to the final result of Shilla Wheat's wrongful death. Had Dr. Wood not settled, the Court could have resolved the philosophical question through the assessment of punitive or exemplary damages for his intentional actions. Furthermore, the Court will take what steps it can to advise the Texas Medical Association of what is nothing less than an atrocity; and will send a copy of Dr. Wood's testimony to that licensing body. The fact that the military physicians were merely negligent does not reduce their responsibility to Shilla Wheat or to her family. The Court has determined that the Government is 50% liable and Dr. Wood is 50% liable for the damages incurred by Shilla Wheat and her family.

Title 28 U.S.C. § 2679 provides that the United States will be liable with respect to tort claims in the same manner and to the same extent as a private individual under like circumstances, but will not be liable for interest prior to judgment or for punitive damages. The Court has carefully resisted any desire to award punitive damages in this case and has struggled to determine an award of damages that accurately compensates Shilla Wheat and her family for her wrongful death; and the pain and suffering, and loss of affection and comfort that all have been forced to suffer. As Justice Spears wrote: Loss of affection, solace, comfort, companionship, society, assistance, and sexual relations were real, direct, and personal losses and these losses are not too intangible or conjectural to be measured in pecuniary terms. *Sanchez v. Schindler*, 651 S.W.2d 249, at 252 (Tex. 1983) *citing Whittlesey v. Miller*, 572 S.W.2d 665, at 667 (Tex.1978). *See also Missouri Pacific R. Co. v. Dawson*, 662 S.W.2d 740 (Tex.App.—Houston [13th Dist.] 1983, writ ref'd n.r.e.). Therefore, the Court has separated each claim in its award of damages, and endeavored to fairly and without emotion decide on the damages.

In this case, it was proven that Shilla Wheat was suffering from severe traumatic depression. The testimony was filled with evidence of the severity of Shilla Wheat's suffering and mental anguish. Consciousness of approaching death is a proper element to be considered in evaluating mental pain and suffering, but it is not the sole element to be considered. *Malone & Hyde, Inc. v. Hobrecht*, 685 S.W.2d 739, at 745 (Tex.App. [4th Dist.] 1985). Her physical and mental suffering was proved by both direct and circumstantial evidence, such as the large number of narcotic drugs prescribed for her for pain. It is a safe presumption in this case that suffering is inevitable as a natural consequence of this type of cancerous invasion of the body. Physical and mental suffering is the necessary result of this cancer. *Id.* The Court will award damages for Shilla Wheat's physical pain and mental anguish before she died. The Court will also award damages for her lost earnings in the past. She suffered medical expenses that were limited due to the fact that most of the expenses were absorbed by the Government. The Court has considered each element of the damages separately, and has not included damages for any one element that is in

any other element. The Court believes that Shilla Wheat suffered as much from the psychological torment of being told that she had no medical illness as she did from the pain of the cancer itself. The physical manifestations of the undiagnosed cancer were obvious to everyone. The Court need only look at the number of prescriptions that Shilla Wheat obtained to deal with her depression; or to hear the agonized testimony of the husband who discovered too late what was causing his wife to cry or get angry for no apparent physical reason. The Court believes that if the question were before the State Supreme Court, it would allow damages for the mental anguish of Shilla Wheat, her husband, her parents, and her two children.

■ Each of the children have a claim for compensation for the loss of their mother, Shilla Wheat. Each suffered a pecuniary loss resulting from the death of Shilla Wheat. The Court will take into account the fact that Joyce was living in Arkansas and was older than Malette, who lived with her mother through most of the pertinent time period. The Court will consider the care, maintenance, support, services, education, advice, counsel, and reasonable contributions of a pecuniary value that each would have received in reasonable probability from Shilla Wheat had she lived. The Court will consider the love, support, companionship, and society that they would have, in reasonable probability, received from Shilla Wheat had she lived. The Court will consider the mental anguish suffered by Joyce and Malette in the past and which in reasonable probability will be suffered in the future resulting from the death of Shilla Wheat.

■ As to the Harpers, the Court will consider the elements of care, services, advice, counsel and reasonable contributions of pecuniary value that Shilla Wheat's parents would in reasonable probability have received from Shilla Wheat if she had lived. The Court will also consider the love, comfort, companionship, and society that each parent would, in reasonable probability, have received from Shilla Wheat if she had

lived. The Court will also consider mental anguish suffered by the Harpers in the past and which in reasonable probability will be suffered in the future resulting from the death of Shilla Wheat.

■ William O. Wheat was with his wife every day of this tragedy. He suffered, as would any husband, as he watched his wife slowly die a lingering death. He felt the helplessness any husband would, at first unable to explain the cause of her physical ailments; then unable to explain how the cancer could have gone undiagnosed and untreated. In the landmark case of *Whittlesey v. Miller, supra,* the Texas Supreme Court held that either spouse has an independent cause of action for loss of consortium that might arise as a result of an injury caused to a spouse by the negligent tortfeasor. 572 S.W.2d at 668. Under this decision, the Supreme Court has accepted the premise that loss of consortium damages are recoverable for even sentimental losses (noneconomic aspects of the marriage relation, *see Des hotel v. Atchison, T. & S.F. Ry.,* 50 Cal.2d 664, 328 P.2d 449 (1958)) including loss of society, companionship, comfort, love and affection, and sexual relations of Shilla Wheat. *Whittlesey,* 572 S.W.2d at 667. The consortium claim of the deprived spouse is derivative of the impaired spouse's cause of action in the sense that liability to the impaired spouse must first be established. *Id.* at 667. This Court will award damages to William O. Wheat for his loss of consortium. The Court will consider in the determination of damages Bill Wheat's loss of consortium in the past, loss of consortium that he will suffer in the future, and the loss of Shilla Wheat's household services in the past and her ability to perform them in the future. As to the claim for wrongful death, the Court will also consider the care, maintenance, support, services, advice, counsel and contributions of pecuniary value that Bill Wheat would have received from Shilla Wheat during her lifetime had she lived. There is no exact date that the Court can determine to denote when the loss began. Loss of consortium can occur prior to the

death of a spouse. *Malone & Hyde, Inc. v. Hobrecht*, 685 S.W.2d 739, 749 (Tex.App.—[4th Dist.] 1985). Shilla Wheat went through several stages of illness due to the malpractice of the co-Defendants. At first, Shilla Wheat had physical symptoms that interfered with their marriage. Eventually, Shilla Wheat would be in a convalescence home apart from her family. On March 10, 1982, she would, mercifully, die.

The *Sanchez* case also raises other legal questions pertinent to this case. The case itself held that a parent can recover damages for the mental anguish and loss of companionship and society for the death of his or her child. 651 S.W.2d 249 (Tex. 1983). The Court reasoned that a parent's recovery for the loss of a child's companionship is closely analogous to recovery for loss of consortium, for which either spouse can recover when the other spouse has been negligently injured. *Id.* at 252.

This raised the serious probability that the Supreme Court would recognize mental anguish and loss of consortium in cases involving the wrongful death of a spouse or parent.

> Injuries resulting from mental anguish may actually be less nebulous than pain and suffering, or injuries resulting from loss of companionship and consortium. A plaintiff should be permitted to prove the damages resulting from a tortfeasor's negligent infliction of emotional trauma. *Leong v. Takasaki*, 55 Hawaii 398, 520 P.2d 758, 767 (Hawaii 1974). This includes recovery for mental anguish. *Id.* at 253.

The clear majority of lower court opinions favored this expansion of recovery. "We hold that recovery of non-pecuniary damages in wrongful death actions is allowable for plaintiffs other than the parents of a minor child wrongfully killed. In particular, the spouse and adult children of a person wrongfully killed may recover such damages." *Air Florida, Inc. v. Zondler*, 683 S.W.2d 769, at 772 (Tex.App. [5th Dist.]—1984); *Missouri Pacific Railroad Co. v. Dawson*, 662 S.W.2d 740 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.); *see also Missouri Pacific Railroad Co. v. Vlach*, 687 S.W.2d 414 (Tex.App. [14th Dist.]—1985); *City of Houston v. Stoddard*, 675 S.W.2d 280, 285 (Tex.App. [1st Dist.]—writ ref'd n.r.e. 1984). The Texas State Supreme Court resolved this question in Plaintiff's favor by writing that

> [t]here is no logical reason to treat an injury to the familial relationship resulting from the wrongful death of any family member enumerated in Tex.Rev.Civ. Stat.Ann. art. 4675 (Vernon 1952) differently than an injury to such relationship resulting from the wrongful death of a child. We therefore hold that the ... children were entitled to recover damages for the mental anguish and loss of companionship resulting from the death of their parent.

*Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 551 (Tex.1985).[1]

■ In a wrongful death action, compensation is proper for intangible as well as tangible elements of damage. These include service, advice, counsel, nurture and care in addition to the financial contribution the Plaintiff could expect from the deceased. *Lee v. Andrews*, 545 S.W.2d 238, 248 (Tex.Civ.App.—Amarillo 1976). Additionally, these Plaintiffs have suffered from their grief, shock, and mental and physical anguish from both the pain and suffering and the wrongful death of Shilla Wheat. Adult children may recover damages for the wrongful death of parents. *Malone & Hyde, Inc. v. Hobrecht*, 685 S.W.2d at 749.

Although *Sanchez* raises some ambiguity about the previously well-settled rule that to obtain damages for mental anguish

---

1. The original Wrongful Death Act was contained in Ch. 35, 1860 Tex.Gen.Laws 33. It did not exist at common law. The purpose of the act was to create a cause of action for a designated class of persons on account of the wrongful death of one bearing a relationship in a certain degree of consanguinity. The persons who are now entitled to bring a wrongful death action are the surviving husband, wife, children and parents of the deceased. Tex.Rev.Civ.Stat. Ann. art. 4675. *See Hofer v. Lavender,* 679 S.W.2d 470, 475 (Tex.1984).

requires physical manifestations, *see e.g.,* *Speier v. Webster College,* 605 S.W.2d 712, 713–15 (Tex.Civ.App.—Eastland 1980), *aff'd in part,* 616 S.W.2d 617, 618 (Tex. 1981); the Court believes that the mental anguish suffered by Shilla Wheat and her family did result in physical manifestations. *Cf. Lucas v. Hartford Accident & Indemnity Co.,* 552 S.W.2d 796 (Tex.1977).

As to damages suffered by Shilla Wheat's parents and children, the Court has considered their physical pain and mental anguish in the past, as well as what they will suffer in the future. Both children have also suffered financially from the loss of their mother.

The Court will also find and award as part of Plaintiffs' compensatory and actual damages the following medical and funeral related expenses:

| | |
|---|---|
| Metroplex Hospital | $10,320.15 |
| Scott & White Hospital/Clinic | 52,197.90 |
| Manteca Hospital | 18,990.19 |
| Palm Haven Convalescent Home | 3,177.29 |
| Dr. Monty Gohl | 205.00 |
| Dr. Melford Larson | 2,597.00 |
| Dr. Dale Stoops | 1,090.00 |
| Temple Urology Clinic | 475.00 |
| Central Valley Radiology | 116.15 |
| Manteca Drug Store | 252.44 |
| Summit Medical Laboratory | 125.60 |
| Funeral Expenses: | |
|   B.C. Wallace & Sons, Inc. | 1,741.00 |
|   Quality Monument Co. | 292.30 |
|   Park View Cemetery | 873.00 |

### *TEX.REV.CIV.STAT.ANN. art. 4590i*

In the Government's Pre-trial order, Defendants list as a contested question of law the application of TEX.REV.CIV.STAT. ANN. art. 4590i. This may have it source in the case of *Wakefield v. United States,* 765 F.2d 55 (5th Cir.1985). Without explanation, and in a conclusory fashion, that panel wrote that "[u]nder Texas law, damages in a case of this nature are limited to $755,000 by statute. *See* TEX.REV.CIV. STAT.ANN. art. 4590i." *Id.* at 58. This Court is placed in the position of interpreting a state statute that has been found to be unconstitutional in two Texas appellate courts. *See Detar Hosp., Inc. v. Estrada,*

694 S.W.2d 359 (Tex.App. 13 Dist.1985) and *Baptist Hospital of Southeast Texas v. Baber,* 672 S.W.2d 296 (Tex.Civ.App.—Beaumont 1984, writ granted). The Texas State Supreme Court has not yet ruled on this issue. This Court believes that whether the statute is unconstitutional will directly affect this case. The Court is of the firm opinion that article 4590i, if constitutional, would apply to the United States as a Defendant in this case.

Article 4590i is entitled the Medical Liability and Insurance Improvement Act. Section 11.02(a) limits civil liability for damages against a physician or health care provider to $500,000.[2] This Court believes that article 4590i should not apply to Defendants in a suit brought under the FTCA. Still, the Court is convinced that if the statute is constitutional, it would control the amount of recovery that could be awarded under 28 U.S.C. § 1346(b), 2674. The Supreme Court of the United States has interpreted the language of the FTCA, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred, to mean the whole law of that State." *Richards v. United States,* 369 U.S. 1, 12–13, 82 S.Ct. 585, 592–593, 7 L.Ed.2d 492 (1962). Thus, if constitutional, article 4590i would limit recovery against Defendant the United States as it would any physician or health care provider in private practice in Texas.

This Court has faced a similar problem before:

It is this Court's duty to apply the law the Supreme Court of Texas would apply to this case. If the law is not explicitly stated, it is the duty of this Court to attempt to determine what the Supreme Court of Texas would decided if it were faced with this case, considering all relevant factors. *See Joan Dubinsky v. Eli Lilly and Company, et al,* Civil Action No. A–82–CA–049, memorandum entered on February 26, 1985, *citing Green v.*

---

**2.** This amount has an economic index so that the maximum is now closer to $800,000.00.

*Amerada-Hess Corp,* 612 F.2d 212, 214 (5th Cir.), *cert. denied,* 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1980) and 19 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4507 (1982) *cf. McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 662–63 (3rd Cir. 1980).

This Court believes that the Supreme Court of Texas will affirm the appellate courts that have found §§ 11.01–11.05 unconstitutional.

The Appellate Court in *Detar Hospital, supra,* wrote:

The wide-sweeping, absolute limitation on liability found in Art. 4590i is an unreasonable infringement of of the Plaintiff's constitutionally guaranteed right to obtain full redress for injuries caused by another's wrongful conduct. Therefore, we hold that those provisions of Art. 4590i, which purport to place such a limitation on the amount of damages a Plaintiff may recover in a medical liability action, are unconstitutional. 694 S.W.2d at 366.

Article 4590i was drafted in response to what was perceived as a medical malpractice crisis occurring in Texas as a direct result of the increasing number of claims filed and the increase in damage awards. The State legislature believed that this would result in higher malpractice insurance rates and a curtailment of medical services to the public. The stated purpose of the Act was to provide a remedy for such a crisis and to avert any reoccurrence in the future. This Court believes that the Texas Supreme Court will determine that these alterations in tort law have proven to be ineffective to ensure that "affordable medical and health care" is "available to the citizens of Texas." Justice Robertson hints at this result in his concurrence in *Nelson v. Krusen,* 678 S.W.2d 918, 926 (Tex.1984). The Supreme Court of Texas could rely on the Texas Constitution. *Id.* The Court could rely on the due process clause of the United States Constitution. This Court has no exact way of establishing how the Texas Supreme Court will hold

the section invalid, but this Court must rely on the indicia of current high court case law and seek conformity in this opinion in a reasonable fashion. The Supreme Court in *Sanchez v. Schindler,* 651 S.W.2d 249 (Tex. 1983) was dealing with an antiquated statute—the pecuniary loss rule as the measure for the death of a child. This Court believes that the Texas Supreme Court in *Schindler* in abolishing this recovery formula was sending a signal of its overall direction in tort law. That Court wrote: "[t]his Court has always endeavored to interpret the laws of Texas to avoid inequity." *Sanchez,* 651 S.W.2d at 652.... This Court has recognized previously that injuries to the familial relationship are significant injuries and are worthy of compensation.

### Article 2212a

The Texas state legislature enacted Article 2212a in 1973. It provides that in negligence actions contribution is permitted among joint tortfeasors in proportion to the percentage of negligent fault found by the jury. The Court amended article 2212a § 2 in 1985 only to the degree of relocating it in the Texas Statutes. TEX.CIV.PRAC. & REMEDIES CODE ANN. § 33.001, *et seq.* (Vernon 1985) now delineates how a settlement by one or more tortfeasors affects these contribution rights. If the settling tortfeasor, in this case Dr. Wood, is not a party to the action at the time the case goes to the jury or finder of fact, so that his negligence is not submitted, the remaining Defendants receive a *Bradshaw, pro tanto* (dollar for dollar) credit for the amount of the settlement. *Id.* at § 33.014. *See Bradshaw v. Baylor University,* 84 S.W.2d 703 (1935). On the other hand, if Dr. Wood remains a party to the lawsuit when it is submitted to the jury or finder of fact, so that his degree of negligence is determined, then the non-settling Defendant receives a pro-rata credit. *See Palestine Contractors, Inc. v. Perkins,* 386 S.W.2d 764 (Tex.1964). In *Cyprus Creek Utility Service Co. v. Muller,* 640 S.W.2d 860 (Tex.1982) the Supreme Court expressly overruled the application of the *Brad-*

*shaw* rule in any case in which article 2212a § 2(e) [now § 33.015] applies. The Court expressly did not overrule *Bradshaw* with respect to cases in which art. 2212a § 2(e) [now § 33.015] does not apply. In other words, *Cyprus Creek* holds that a finding by the finder of fact of a settling tortfeasor's percentage of negligence requires proportionate reduction under article 2212a § 2(e) [now § 33.015]. Plaintiffs have requested that the Court determine the percentage of negligence of both Dr. Wood and the United States. If the percentage of fault of Dr. Wood is submitted and is determined, "the amount paid by [by the settling Defendant] Dr. Wood in settlement is irrelevant." *Cyprus Creek*, 640 S.W.2d at 864. The percentage attributed to the settling Defendant reduces the liability of the remaining Defendants to the Plaintiff by the percentage of negligence attributed to the settling Defendant by the jury.

The Court has therefore carefully reviewed the testimony and evidence presented in this case. As the Court heard the evidence during trial the actions of Dr. Wood and those of the military physicians who treated Shilla Wheat not only shocked the conscience of the Court but would likewise shock the collective consciences of civilized men and women be they laymen, lawyers or technical experts. What is even more disturbing than the unexplainable lack of competence and reasonable medical care provided to Shilla Wheat by the individual private physician, Dr. Wood, is the picture of continuing negligence of a host of military physicians painted clearly and without reason or justification in the record of this case.

In 1928, Justice Brandeis wrote in his famous dissenting opinion: "Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed.2d 944 (1928). If the example of medical care and treatment afforded to Shilla Wheat, a United States military dependent, is an example of the reverence displayed by the United States toward the health and welfare of its military personnel who stand ever ready to sacrifice for freedom's cause, then our military medical complex is teaching a deadly lesson to those whom it exists to protect. It is natural to assume from the frailities of human beings that on occasion an individual physician will not meet the minimal standard of reasonable care in his treatment of a patient—people, including physicians, make mistakes and our legal system is designed to compensate victims of medical negligence in at least some measure. What is impossible for this Court to justify or sympathize with is the clear evidence in this case of the continuing medical negligence practiced on Shilla Wheat by a succession of military physicians practicing in military hospitals and clinics under the auspices of the Government of the United States. This Court seeks not to punish and will not punish through damage award the United States for the negligence of its physicians treating Shilla Wheat. This Court only seeks to compensate the Plaintiffs for their just and reasonable monetary loss. The record in this case; however, suggests without question that there was not only a discoverable and treatable malignancy growing within the body of the deceased—there may also be a treatable malignancy present in the medical standard of care offered by the military medical system to those it purports to serve. This case may represent the discovery of the system's cancer. Should the United States fail to correct the procedures that negligently caused the untimely death of Shilla Wheat and the irreplaceable loss to her loved ones, then Shilla Wheat suffered and died in vain.

1. The Court finds that Plaintiffs have suffered damages in the amount of $6,700,-000.00 as a result of Shilla Wheat's death.

2. The Court finds that the negligence of Defendant Dr. Wood was not the sole cause of Plaintiff's injuries, he and the United States were joint tortfeasors. Either one or both could have prevented the injuries and neither did. Therefore, the Court finds that the negligence of these

co-tortfeasors proximately caused the wrongful death of Shilla Wheat.

 3. The Court finds that the comparative causation should be apportioned fifty percent (50%) to the United States of America and fifty percent (50%) to Dr. Harold Wood.

4. The Court awards no punitive damages against the United States.

 5. The Court hereby finds damages in the total amount of $6,700,000.00, 50% of which is awarded against Defendant, the United States, apportioned to the Plaintiffs as follows:

A. The Court finds damages for William O. Wheat in the just and reasonable amount of $1,800,000.00. The Court therefore finds damages against the United States of America to be $900,000.00.

B. The Court finds damages for Shilla Malette Wheat in the just and reasonable amount of $1,000,000.00. The Court therefore finds damages against the United States of America to be in the amount of $500,000.00.

C. The Court finds damages for Freda Joyce Watson in the just and reasonable amount of $500,000.00. The Court therefore finds damages against the United States of America to be in the amount of $250,000.00.

D. The Court finds damages for Catherine Harper in the just and reasonable amount of $200,000.00. The Court therefore finds damages against the United States of America to be in the amount of $100,000.00.

E. The Court finds damages for Albert Harper in the just and reasonable amount of $200,000.00. The Court therefore finds damages against the United States of America to be in the amount of $100,-000.00.

F. The Court finds pursuant to Article 5525 [§ 71.021], Texas Survival Act damages for Shilla Wheat in the just and reasonable amount of $3,000,000.00. The Court therefore finds damages against the United States of America to be in the amount of $1,500,000.00.

G. The Court will award costs of court to Plaintiffs as well as post-judgment interest pursuant to 31 U.S.C. § 1304(b)(1).

### JUDGMENT

The Court has considered all of the issues presented at the trial in this case. The Court will enter judgment for Plaintiffs and against Defendants, the negligence to be apportioned fifty percent (50%) to the Defendant United States of America and fifty percent (50%) to the Defendant Dr. Harold L. Wood.

Judgment is hereby entered for Plaintiffs in accord with the Order entered today.